Bowlin vs. Commonwealth.

---

CASE 3—INDICTMENT—JUNE 5.

## Bowlin vs. Commonwealth.

APPEAL FROM FAYETTE CIRCUIT COURT.

1. Each State, so far as not prohibited by her own constitution or that of the United States, has the unquestionable right to regulate her own domestic concerns and prescribe remedies, *including rules of evidence*, in her own courts.

2. Congress had no constitutional authority to repeal or essentially modify the law of Kentucky on the subject of negro testimony.

3. A negro is incompetent to testify against a white man under the laws and in the courts of Kentucky.

Z. GIBBONS,                                        For Appellant,

CITED—

*Civil Code, sec.* 670, *subdivis.* 7.
*Const. U. S., art.* 1, *sec.* 8; *also art.* 10.
*Crim. Code, sec.* 238.

JNO. M. HARLAN, Attorney General,          For Appellee.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

*William J. Bowlin,* a free white man, indicted for grand larceny in the Fayette circuit court, being sentenced to

Bowlin vs. Commonwealth.

the Kentucky penitentiary for five years, on the testimony of *George Gardner, a free negro*, appeals to this court for a reversal of the judgment of conviction, on the ground that the circuit court erred in admitting, against his protest, the said evidence as competent.

By the *1st section of chapter* 107, *Stanton's Revised Statutes of Kentucky, page* 470, it is enacted: "That a slave, *negro*, or Indian, shall be a competent witness in a case of the Commonwealth for or against a slave, negro, or Indian, or in civil cases to which only negroes or Indians are parties, *but in no other case.*"

And this enactment, never having been repealed by Kentucky, is now the law ruling this case in this court, unless it has been abolished by the *1st section of the "Civil Rights Bill,"* whereby Congress enacted: "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, and *give evidence,* inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens; and shall be subject to like punishment, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding."

This enactment evidently applies to all courts, State or Federal. If Congress had constitutional power to repeal or control the Kentucky law *supra,* the foregoing act for

legalizing the testimony of free negroes in all cases is the law of this case, and the circuit court did not err in admitting the evidence of *George Gardner;* but if there was no such power, that enactment was a mere *brutum fulmen,* and not law, and the admission of the testimony, consequently, was erroneous. However anarchy may, in fact, have lately predominated without the practical control of fundamental principles, the Constitution of the United States is still rightfully the supreme law of the land, and as supreme over the will of Congress as it can be over that of the President or of any citizen or party.....

Each State, so far as not prohibited by her own Constitution or that of the United States, has the unquestionable right to regulate her own domestic concerns, and prescribe remedies, *including rules of evidence,* in cases in her own courts; and we presume that Congress would never assume authority to regulate the testimony of free white citizens in State courts. The " civil rights bill" has attempted no such presumptuous absurdity. Then, whence does Congress derive its asserted authority for class legislation, applicable to the evidence of the colored race alone, and whereby negroes might be made competent witnesses in cases in which, by the local law of the forum, white persons are made incompetent?

The only possible source of such anomalous power must be the constitutional amendment for abolishing slavery, in the following words :

" Sec. 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

" Sec. 2. Congress shall have power to *enforce this article* by appropriate legislation."

The utmost legal effort of the emancipating section was to declare the colored *as free as the white race* in the United. States. It certainly gave the colored race nothing more than freedom. It did not elevate them to social or political equality with the white race. It neither gave nor aimed to give them, in defiance of State laws, all the rights of the white race, but left them equally free in all the States, and *equally subject to State* jurisdiction and State laws. Without the second section, therefore, there could be no pretext for a claim by Congress for special legislation for the colored race which would be unauthorized in relation to the white race of freemen.

And whatever may have been the unspoken aim of the second section—to secure the only end of the first section—*freedom to all and nothing more*, was the only constructive object, and is the inevitable effect of this section. Notwithstanding the abolition of slavery, a State in which "freedmen" reside might attempt their disfranchisement, or withhold from them the privileges of free men.

To prevent any such frustration of the aim and effect of the declared emancipation was obviously the object, and must be the only legitimate effect, of the second section. "Power to enforce *this article* by appropriate legislation" can import nothing more than to uphold the emancipating section, and prevent a violation of the contemplated liberty of its enfranchised race. It could not mean that Congress should have power to legislate over their civil rights and remedies in the States any more than over those of all other citizens; and it certainly does not squint at any such legislation as to white citizens. If it authorize Congress to make freed negroes competent witnesses against white citizens in State courts in opposition to State laws, it not only means

Bowlin vs. Commonwealth.

more than could ever become necessary for the simple purpose of upholding, against the interfering will of States or of white citizens, the declared emancipation, but would place the black race, *in all the States*, under the pupilage of Congress, free from the control of the local sovereign that governs the white race, and ought to have the same jurisdiction over all citizens, black as well as white. Such an absurd anomaly as the legislation by Congress for one portion of the citizens of the same State, and the legislation by the State for another portion of her citizens, could never be tolerated by any statesman or jurist. And moreover, if such an absurdity could be admitted, the power of Congress in relation to the black race might not only be practically exclusive, but, to a great extent, might abrogate the power of the States in relation to the white race. Such a monstrous construction of the second clause would yield to the arbitrary will of Congress absolute control over the interests and destiny of the black race, and the like control over the white race, so far as its rights might, *in the opinion of Congress*, conflict with the *interest* of the blacks. And on this theory Congress might take from white citizens their property and give it to black citizens; and might, as assumed in the " civil rights bill," legislate over *all* contracts in the States to which black citizens are, in any way, parties. And the unqualified " same power to make and enforce contracts " attempted to be given by that bill to black citizens would legalize intermarriages between the two races deteriorating to the Caucasian blood, and destructive of the social and legislative decorum of States. But that is as constitutional as the provision for regulating negro evidence—both requiring the same unwarrantable assumption.

Bowlin vs. Commonwealth.

Surely no such Federal legislation could be either necessary or " appropriate " to " enforce " the " article " of emancipation as contemplated by the second section; but if that section authorize Congress to repeal State law as to negro testimony, *it must, on the same vagrant assumption, vest Congress with unlimited power over one class of the citizens of each of the States.* This argument *ex absurdo* seems logical and the conclusion inevitable; and our interpretation of the second section accords also with the significant fact that any interpretation of it more latitudinary was, in and out of Congress, disclaimed by its leading advocates during its probation before its final ratification.

Without elaboration of what seems to this court a self-evident proposition, we conclude that Congress had no constitutional authority to repeal or essentially modify the law of Kentucky on the subject of negro testimony; and that, consequently, our own State law is the only law of this court, and must rule this case.

George Gardner was, therefore, incompetent to testify against the appellant, and the circuit court erred in admitting his testimony.

Wherefore, the judgment of conviction is reversed, and the cause remanded for a new trial.

JUDGE WILLIAMS DELIVERED THE FOLLOWING SEPARATE OPINION:

The only question in this case is as to the competency of the witness, George Gardner, who is a free man of African descent, known otherwise as a " *negro.*"

It is provided by *section* 1, *chapter* 107, *Revised Statutes* (*vol.* 2, 470), " that a slave, negro, or Indian, shall be a competent witness in a case of the Commonwealth for or against a slave, negro, or Indian, or in a civil case

Bowlin vs. Commonwealth.

to which only negroes or Indians are parties, *but in no other case.* This shall not be construed to exclude an Indian, in other cases, who speaks the English language and understands the nature and obligation of the oath."

This statute of the State has never been repealed by the State Legislature.

The appellant was indicted and convicted of a larceny. The witness was permitted to testify against him, notwithstanding his protest.   This decision of the circuit court is attempted to be justified under the enactment of the last session of the Thirty-ninth Congress of the United States, known as the " civil rights bill."   There is no clause in this statute of Congress which, in language, attempts to regulate the civil proceedings in a State court, nor that makes it obligatory on either State courts or State officers to enforce its provisions.   Congress had the undoubted right to regulate the proceedings of the Federal courts, and to declare who should be competent witnesses therein, as well as who should be competent jurors, &c.; and, as it has been uniformly decided by the supreme court of the United States that Congress could not enforce on the State officers or *courts* the administration of its laws, this act must be construed as applying to United States courts and officers alone, in the absence of any explicit enactment imposing this duty on the State *judiciary* and officers.   It is true that, by the second section of this act, it is provided, " that *any person* who, under color of any law, statute, ordinance, regulation, or custom, shall subject any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishments, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the

party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisoned not exceeding one year, or both, in the discretion of the court." But the next section gives exclusive jurisdiction to Federal courts, excluding the State courts, " of all 'crimes and offenses committed against the provisions of this act," and " *of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be, any of the rights secured to them by the first section of this act;* and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever, or against any officer, civil or military, or other person, for any arrest or imprisonment, trespass, or wrongs done or committed by virtue or under color of authority derived from this act, * * * * * such defendant shall have the right to remove such cause for trial to the proper district court or circuit court in the manner prescribed by the act relating to *habeas corpus*, and the amendatory acts thereto."

If any party, *belonging to these privileged classes*, be sued in a State court, he may remove his cause to the United States courts; or if he is the plaintiff, he may, by virtue of these several acts, select his forum in which to prosecute it.

Congress has made it the duty of the Federal officers and Federal judiciary to administer those laws, but it has not made it the duty of the State officers and the State judiciary to do so.

And it could hardly be expected of a State court, which is bound by the most sacred obligations faithfully

and impartially to administer the laws of the State, that it should, in a case peculiarly within its cognizance, ignore the constitutional enactments of the State Legislature to administer a statute of Congress which, in its terms, does not impose the duty of its administration on the State courts, but, by very general language, denounces penalties on all who violate its provisions.

No court, either State or national, has as yet so far forgotten its own dignity, independence, and impartiality, as to construe general statutes denouncing pains and penalties against all offenders and violators of its provisions as embracing judicial tribunals, whose peculiar duties it is to honestly construe the statutes and laws generally, for this would be to make an honest conviction of the meaning of a law an offense, should another court differ from it in its construction.

To construe these pains and penalties, denounced against the violators of the statute, in general language, as embracing judicial tribunals, who must act upon their honest convictions and interpret the laws accordingly, is to violate every principle, constitutional or legal, which has universally prevailed, both in America and England, for the protection, purity, and independence of the judge.

And to strike from both the national and State constitutions that great recognized principle that the powers of the government are divided into three distinct departments, to-wit: the legislative, executive, and judiciary, and that each are independent of and co-ordinate with the others, and to humble the judiciary in the most degraded manner at the feet of the legislative.

Both these constitutions have secured the faithful discharge of duties by their respective judiciaries, as well as other civil officers, by making them liable to impeachment

and removal from office; but not by denouncing pains and penalties against them to be inflicted by other courts.

If this second section, then, be construed as not embracing the State judiciary, there is nothing in the other sections which even by general terms can be construed as relating to them, but the whole statute is for the administration of the Federal courts and directory to the Federal officers.

This must be so if the principles be correct which were involved by Ohio in her conflict with Kentucky, and which were established by the supreme court of the United States in 24 *How.*, 95.

But if it be conceded, as it is claimed, that the State judiciary and State officers are embraced in this congressional enactment, and intended to be so embraced, *whence the constitutional power in Congress to impose such duties on the State judiciary, and to denounce such penalties for their non-observance?*

Every attentive and philosophic reader of the history of the Constitution and the debates of the convention which framed it, has observed that there were two main theories which were prominent and predominating in the convention.

One was, that as each State was a sovereignty, and had a perfect government already in existence, vested with the whole political power of their respective populations, and then having a compact between these sovereignties, that their delegates could not act as if the whole or any considerable part of that power could be transferred by the people themselves to another government; that whatever power was to be conferred on a central government must be granted by the States as political corporations, and that therefore the principle of the Union, as existing in the confederation, could not be

changed, whatever additions to its authority it might be expedient to make, and therefore the Federal equality of the States must be continued.

The other theory was, that as they were now making a national government, the democratic masses of all the States should be represented, and that numbers should determine the representation in each House of the national Legislature; that real peace and freedom could not be attained if five hundred thousand people, dwelling in one political division of the country, possessed only the same voice in the enactment of the laws as fifty thousand dwelling in another division. And these two theories continued to be debated from June 19th to July 5th, with all the sincerity that interest lends to conviction, and all the tenacity that conviction can produce, both intensifying the warmth and profoundness of these discussions.

The larger States were deeply interested in establishing the democratic theory of representation based upon numbers, whilst the smaller States were vitally interested in the Federal principle of equality of representation without reference to numbers.

And upon Mr. Ellsworth's motion to allow equal representation to the States in the Senate, the vote was equally divided, Connecticut, New York, New Jersey, Delaware, and Maryland voting aye; Massachusetts, Pennsylvania, Virginia, North Carolina, and South Carolina voting nay, and Georgia equally divided.

The convention was now brought to a dead lock on these conflicting theories, and barren, naked failure was imminent.

This resulted in the raising of a committee of one from each State, which finally reported a plan of equal representation of the States in the Senate and a representation of the democratic masses in the lower House, with power

alone in the popular branch of Congress to originate all
bills for raising and appropriating money.

The jealousy of the States did not end with the organ-
ization of the national Legislature, but continued through-
out the entire details of the Constitution, and particularly
on that branch defining the subjects over which Congress
might legislate, and the powers conferred upon the differ-
ent departments and officers, executive and judicial.

Having conferred upon Congress the power to levy and
collect taxes, duties, imposts, and excises to pay the debts
and provide for the common defense and general welfare
of the United States; to borrow money; to regulate com-
merce with foreign nations and among the several States
and with the Indian tribes; to establish a uniform rule of
naturalization, and uniform laws on the subject of bank-
ruptcies; to coin money and regulate its value, and fix
the standard of weights and measures; to provide for
the punishment of counterfeiting the securities and cur-
rent coin of the United States; to establish post-offices
and post-roads; to promote the progress of science and
useful arts; to constitute tribunals inferior to the supreme
court; to define and punish piracies and felonies on the
high seas, and offenses against the laws of nations; to
declare war, grant letters of marque and reprisals, and
make rules concerning captures on land and water; to
raise and support armies; to provide and maintain a
navy; to make rules for the government and regulation
of the land and naval forces; to provide for calling forth
the militia to execute the laws of the Union, to suppress
insurrections and repel invasions; to provide for arming
and disciplining the militia; to exercise exclusive legis-
lation in all cases over such district as may become the
seat of government of the United States, and all other
places for the erection of forts, &c.; and finally, to make

Bowlin vs. Commonwealth.

all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the United States, or in any department or officers thereof. (*Sec.* 8, *art.* 1, *U. S. Constitution.*)

The next subject of great difficulty was how far and by what means a negative should be placed on State legislation. It was proposed to vest this power of negation with the legislative subjects and powers. This was strenuously resisted because such a power in the Federal government would be entirely inconsistent with the sovereignty of the States, as this would subordinate their entire legislation to the legislation of the national government, and be inconsistent with the predominant intent to extend the direct authority of the national Legislature only to certain objects of national concern, and retain in the States all the political powers the surrender of which was not involved in the grant of powers to the national head.

Besides, it was insisted that any supposed conflict between State and national legislation *was, in its nature, judicial*, and, therefore, to class it among the legislative powers, was to commit the subject to an unfit arbitration, instead of giving it to a department that would have no direct interest in maintaining or enlarging the prerogatives of the government whose powers might be involved.

It was finally determined that the judicial power of the nation should be vested in " one supreme court, and in such inferior courts as Congress might ordain ;" and that the judicial power should extend " to all cases of law and equity arising under this Constitution, the laws of the United States and treaties made in pursuance thereof, or which shall be made under their authority ;

to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty, and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between citizens of different States; between citizens of the same State claiming lands under grant of different States; and between a State or citizens thereof, and foreign States, citizens, or subjects." (*Section 2, article 3, United States Constitution.*)

The next section gave original jurisdiction in certain of these cases to the supreme court, and declared that in others it should only have appellate jurisdiction.

Having created a Congress and specified the subjects over which it should legislate, and ordained a judiciary and its jurisdiction, to still better guard the States and national government from conflict, by *section 9, article 1,* limitations of various kinds were also imposed on the Federal government, and by *section* 10 prohibition on the States are declared.

And finally, though having well defined the powers conferred on the United States, lest there should still be some imperfections therein, by *section 2, article 6, subsection 2,* it was declared " that this Constitution, and *the laws of the United States made in pursuance thereof,* and all treaties made, or which shall be made, under the authority of the United States, *shall be the supreme law of the land;* and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

And lest there still should be room for misunderstanding, several of the States, from a watchful, vigilant jealousy, when they ratified the Constitution, suggested various amendments, and out of respect to their desires, the first session of Congress held under the Constitution

submitted ten amendments, which the States ratified, the tenth of which declares that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are *reserved* to the States respectively, or to the people."

It is lamentably true that in the political, legislative, and judicial history of the country, sometimes the States, first of the one section and then of the other, have asserted a supremacy and powers wholly incompatible with the powers and supremacy of the government of the United States, as defined in its Constitution, as passion, prejudice, and interest might dictate, and then again to be followed by the assertion of powers and supremacy in the national government wholly inconsistent with the reserved powers and constitutional prerogatives of the States, and utterly inconsistent with the previous history and actions of the same party, but still inspired by that same passion, prejudice, or interest; but amid this inconsistent and incongruous action of political parties and legislative enactments and State adjudication, the supreme court of the United States, being alike the representative of the Federal government and all the States, has nobly raised itself above this conflict of strife and of prejudice and of inconsistency, and stood as the mighty forum of impartiality, of integrity, of intelligence, and of *justice* and of *consistency*, until indeed it is justly regarded as one of the bulwarks of our liberties.

By its teachings and profound philosophy, and imperishable adjudications, let this question be tested. During the war of 1812 with Great Britain a body of men met at Hartford, Connecticut, who called themselves a convention, their object being lawless, and the exercise by the States of rights and powers wholly inconsistent with the just powers of the national government, because

their sentiments and interest conflicted with the national cause.

Many of the free States, since then, have enacted statutes conflicting with the acts of Congress made on subjects expressly conferred by the United States Constitution, because the national laws were odious to them, thus asserting a supremacy of State over national legislation; and the Legislature of Massachusetts actually addressed out of office a State judge because he administered a statúte of Congress which the supreme court had pronounced constitutional, but which was in conflict with the enactments of the State. The State of Ohio, through its Governor, refused to obey a statute of Congress enacted by the express authority of the Constitution of the United States.

The supreme court of Wisconsin, placing itself on an assumed State supremacy over the nation, pronounced a statute of Congress unconstitutional, notwithstanding the Federal judiciary and supreme court of the United States held it valid, and released from imprisonment a citizen convicted by the United States court, and then in prison under its judgment, and pronounced its judgment final, and ignored the right of the supreme court of the United States, on appeal, to review its decision; and this in defiance of the Constitution of the United States and the acts of Congress in pursuance thereof.

All this was when the enactments and administration of the national government were distasteful to them.

When the administration and enactments of the national government were likely to become distasteful and injurious to the southern States, instead of seeking the legal and peaceful forums of the Constitution, they asserted likewise a State supremacy wholly incompatible with the rights, powers, and prerogatives of the national government.

Bowlin vs. Commonwealth.

And thus the action of many of the States of both sections have, from time to time, as passion, prejudice, and interest might incline them, been lawless and revolutionary; and the predominant theories of the convention, and the conflicts between the advocates of federal equality and democratic ascendency have been alternately advocated and repudiated by the same States, according to their varying sentiments and interests, until a most unhappy and destructive conflict has prostrated the powers of the States and invigorated the powers of the national government. Now the danger has shifted from an undue State supremacy and consequent disintegration of the national government, to an undue supremacy in the national head, usurping the reserved rights of the States and destroying their government by a concentration of their powers in it.

But it should be remembered that in the uncertain and ever-changing sentiments of the masses in a republic, the only safety is in the strict adherence to the fundamental compact, for the majority that invokes an undue and unconstitutional power to advance a favorite project, may soon find itself in a minority, and in turn be crushed by that same undue and assumed power.

We turn now to the examination of the reserved and sovereign right of the States which the national government may not invade, and which have been held as sacred and free from control by both the legislative and judicial departments of the national government for three quarters of a century.

In *New York vs. Dibble,* in expounding a statute of the State prohibiting any one but Indians from settling upon or residing on lands belonging to or occupied by any tribe of Indians in the State, the supreme court of the United States, 21 *Howard,* 370, said:

" Notwithstanding the peculiar relations which these Indian nations hold to the government of the United States, the State of New York had the sovereign power over their persons and property, so far as it was necessary to preserve the peace of the Commonwealth and protect these feeble and helpless bands from imposition and intrusion. *The power of a State to make such regulations to preserve the peace of the community is absolute, and has never been surrendered*."

Hence it was decided, that whatever may have been the claims of the relators to the 12,800 acres of land, called the Towanda tract, which they claimed the Senaca Indians, by treaty with the United States of May 20, 1842, conveyed to their vendors, Ogden and Fellows, yet the State of New York could constitutionally enact this statute.

And in *Ableman vs. Booth, and United States vs. Booth*, on error to the supreme court of Wisconsin (21 *Howard*, 516), the supreme court of the United States, in discussing the right and power of a State court to interfere with the proceedings of the United States court, and to release from imprisonment a citizen then incarcerated by the judgment of the United States court for the violation of an act of Congress, which the State court held to be unconstitutional and invalid, said :

" And the power of the general government and of the State, although both exist, and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge or a State court, as if the line of division was traced by land-marks and monuments visible to the eye."

Bowlin vs. Commonwealth.

Again it said : " It was essential, therefore, to its very existence as a government, that it should have the power of establishing courts of justice altogether independent of State power, to carry into effect its own laws, and that a tribunal should be established in which all cases which might arise under the Constitution and laws and treaties of the United States, whether in a State court or a court of the United States, should be finally and conclusively settled. Without such a tribunal, it is obvious that there would be no uniformity of judicial decision ; and that the supremacy (which is but another name for independence) so carefully provided in this clause of this Constitution, could not possibly be maintained peacefully, unless it was associated with this paramount judicial authority."

And again : " This tribunal, therefore, was erected, and the powers of which we have before spoken conferred upon it, not by the Federal government, but by the people of the States who adopted and formed that government, and conferred upon it all its powers, legislative, executive, and judicial, which it now possesses."

. And again : " This judicial power was justly regarded as indispensable, not merely to maintain the supremacy of the laws of the United States, but also *to guard the States from encroachments upon their reserved rights by the general government.*"

And in referring to the difference in the supremacy of the legislative and judicial authorities, " in the first case it provides that this Constitution, and the laws of the United States *which shall be made in pursuance thereof,* shall be the supreme law of the land," and, therefore, "*if it passed a law not authorized by its enumerated powers, it was not to be regarded as the supreme law of the land,*" whilst, " the jurisdiction of its courts shall extend to all cases arising under this Constitution and laws of the United

States;" therefore, "the judicial power covers every legislative act of Congress, whether it be made within the limits of its delegated powers, or be an assumption of power beyond the grants in the Constitution." And again it most truthfully and philosophically said, "nor can it be inconsistent with the dignity of a sovereign State to observe faithfully, and in a spirit of sincerity and truth, the compact into which it voluntarily entered when it became a State of this Union. On the contrary, *the highest honor of sovereignty is untarnished faith.*"

Thus the objects, character, and powers of the Federal government, and the supremacy of its laws, *enacted in pursuance of the Constitution,* and the supremacy of its judiciary, were patiently and profoundly developed.

In the *Commonwealth of Kentucky vs. Dennison, Governor of Ohio* (24 *How.*, 66), the supreme court, in a case of mandamus, sued out by Kentucky against the Governor of Ohio to compel him to surrender a fugitive from justice, which he had refused to do, proceed to show that, under the second paragraph of *section* 2, *article* 4, *United States Constitution,* which is as follows: "A person charged in any State with treason, *felony,* or other crime, who shall flee from justice, *and be found* in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime," and the several acts of Congress, it was *the duty of the chief executive* officer of Ohio to surrender the fugitive; yet, said the court, "the words '*it shall be the duty*,' in ordinary legislation, imply the assertion of the power to command and to coerce to obedience. But looking to the subject-matter of this law, and the relations which the United States and the several States bear to each other, the court is of opinion the words, '*it shall be the duty*,'

were not used as mandatory and compulsory, but as declaratory of the moral duty which the compact created when Congress had provided the mode of carrying it into execution. The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the executive of the State; *nor is there any clause or provision in the Constitution which arms the government of the United States with this power. Indeed, such a power would place every State under the control and dominion of the general government, even in the administration of its internal concerns and reserved rights. And we think it clear that the Federal government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it; for if it possessed this power, it might overload the officer with duties which would fill up his time, and disable him from performing his obligations to the State, and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State."*

The court proceeds to say, " that Congress may authorize a particular State officer to perform a particular duty; but if he declines to do so, it does not follow that he *may be coerced or punished for his refusal.*"

And " that in the early days of the government, Congress relied with confidence upon the co-operation and support of the States, when exercising the legitimate powers of the general government, and were accustomed to receive it upon principles of comity, and from a sense of mutual and common interest, where no such duty was imposed by the Constitution, and laws were passed authorizing State courts to entertain jurisdiction in proceedings by the United States; and these powers were exercised for some years by State tribunals, until some of the States declined, because it retarded and interfered with duties

which properly belonged to them as State courts; and in others doubts appear to have arisen as to the power of the courts, acting under authority of the States, to inflict these penalties for offenses against the general government, unless specially authorized to do so by the States."

And finally, they determined that "if the Governor of Ohio refused to discharge his duty, *there is no power delegated to the general government, either through the judicial department or any other department, to use any coercive means to compel him.*" And thus stood the relative *rights and powers, and supremacy of the United States and the several States,* as expounded by the chosen agent and final tribunal and arbiter of the nation and the States down to the year 1860.

We come now to examine what has since been done to enlarge these powers of the national government, and to give it the monstrous power of invading the precincts of the State courts and directing them as to who they shall receive as competent witnesses or jurors, or otherwise controlling their proceedings.

Since then there has been but one amendment to the Constitution of the United States, and which is known as article 13, and is as follows :

" SEC. 1. Neither *slavery nor involuntary servitude,* except as a punishment for crime, whereof the party shall have been duly convicted, *shall exist within the United States, or any place subject to their jurisdiction.*

" SEC. 2. Congress shall have power *to enforce this article by appropriate legislation.*"

This language is so plain and simple, and free from confusion and complication of subject, that it is hard to perceive how the logical, dispassionate, judicial mind could feel embarrassed or misunderstand it, whatever

may be the false construction placed on it by politicians at the "hustings."

Whilst not essential to show the construction placed on it by its advocates before it had been submitted, and whilst under consideration by Congress, yet I will quote from its most distinguished advocate in the United States Senate. Mr. Sumner, of Massachusetts, April 8, 1864, ( *Congressional Globe, part* 2, *first session, Thirty-eighth Congress, pp.* 1482–3), said: "But the immediate question now before us is on the proposition to prohibit slavery by constitutional amendment; and here I hope to be indulged for a moment as to the form it should take."

The committee had then reported it in the exact language of the amendment as it now stands.

Mr. Sumner then suggested the following as a substitute :

" *All persons are equal before the law,* so that no person can hold another as a slave ; and the Congress shall have the power to make all laws necessary and proper to carry this *declaration* into effect everywhere within the United States and the jurisdiction thereof." It did not require the powers of Mr. Sumner to show how much more comprehensive, and how much more power would be delegated by a *declaration* that *all men were equal before the law,* and that Congress should have power to carry it into effect, than the simple, significant declaration that *slavery* should no longer exist, and Congress should have the right to enforce this provision by appropriate legislation. The manifestation against Mr. Sumner's substitute was so decided that he really never offered it, but suggested in place of the amendment, as reported by the committee, a change in its language, as follows :

" Slavery shall not exist anywhere in the United States or the jurisdiction thereof; and the Congress shall have

power to make all laws necessary and proper to carry this prohibition into effect."

He conceded that this was the identical proposition pending, as reported by the committee, but only a change in phraseology. He said: "This is simple, and avoids all language which is open to question. The word *slavery is explicit, and describes precisely what it is proposed to blast.*"

His objection was to the exception in the amendment, as reported by the committee, as he said that might be construed to authorize a *selling into slavery as a punishment for crime.*

Its advocates proposed to do nothing more than to abolish slavery by constitutional amendment, and then, to secure this beyond peradventure, to confer upon Congress the power to consummate this by appropriate legislation. What is it that may be enforced by appropriate legislation? *The abolishment of slavery.* When that is done, the full power conferred is exhausted.

Its most ardent advocates, then, did not dream of claiming by virtue thereof the right of Congress by enactment to invade the reserved rights of the States, to enter their courts and dictate the rules of evidence, competency of witnesses, qualification of their jurors, judges, or other officers, or to control by legislation the laws of descents, the laws of marriage, including the connubial relations and laws regulating divorce, the qualification and rights of citizenship of the States, the laws of contract, the laws regulating the title to real and personal estate, to control the laws of escheat, to declare that illegitimates shall be equal heirs with those born in lawful wedlock, to repeal or modify the laws regulating marriage, to control the penal and criminal laws of the States by the repeal of its punishments, or providing things shall be crimes or misdemeanors which are not so regarded by

the laws of the States, and thus to have the power, to be exercised at their own will, of repealing the laws of the States; and all these things, as monstrous as they appear, are as fully authorized by said amendment as is the right to regulate the competency of witnesses. If Congress can declare the competency of witnesses, it can also regulate the qualification of jurors, of the judges, clerks, sheriffs, and all other officers of the States.

Slavery, as Mr. Sumner said, had an explicit, well-defined, and thoroughly understood meaning. No word in the English language, indeed, was better understood. Then to say that the power to abolish slavery includes the right to make the freedman a competent witness, is simply an absurdity, a broad and unmitigated perversion of language and the well-defined meaning of the term. Congress had the power, before this amendment, to make either the freedman or slave a competent witness in the Federal courts, but had no right, either before or since, to legislate, directly or indirectly, as to the competency of witnesses in the State courts, and the State courts are not bound to administer its enactments under any view of the case. They may do so on the principle of comity. But it is clear that Congress did not predicate their power to enact this " civil rights bill " upon this amendment, as is manifest from its provisions.

The amendment referred to *slavery*. Consequently the only persons embraced in its provisions, and for which Congress was by it authorized to legislate in any manner, *were those then in slavery*. Yet the first section of this " civil rights bill " provides, that every "*person born in the United States*" not subject to any foreign power, excluding Indians not taxed, " are hereby declared to be citizens of the United States; and such citizens, of *every race* and *color*, without regard to any previous condition

of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right in every State and Territory in the United States to make and enforce contracts; to sue and be sued, be parties, *give evidence;* to inherit, purchase, lease, sell, hold, and convey real and personal property; *and to full* and *equal benefit* of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishments, pains and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding."

This embraces every one born in the United States, except subjects of foreign powers and the untaxed Indians, whether *slave* or *free, Mexican, Algerine, Chinaman, Japanese, Dahomean, Goth, Vandal* or *Tartar, Turk, Pagan, Mahommedan* or *Christian,* and gives them all the civil rights of the actual native-born citizen of the States, whether of the absolute class, embracing life, liberty, locomotion, and property, and character, or of the relative class, involving the relations of parent and child, husband and wife, guardian and ward, and master and servant, with a right to testify, independent of religious faith or education or understanding.

Thus with one fell swoop invading the sovereignty of the States, and regulating their domestic and internal concerns; and if it can do this, no subject is perceived upon which it may not regulate for the several States, and thus the people of Kentucky must be legislated for by the people of Massachusetts in matters in which they can have no direct information or presumed interest, and *vice versa.* So that the people of each State, instead of being left free to regulate their own domestic concerns, will have them regulated by the representatives of the other States,

and, therefore, as the representatives of the other States must greatly outnumber the representatives of even the largest State, no State will longer have the exclusive right to legislate for herself even over her own domestic affairs; and thus Congress will not only possess the power of negation over State laws, *but more, the power to invade their sovereignty, and to enforce upon them unjust, unwise, unwholesome, and distasteful laws,* and this contrary to the historical action and intention of the convention and the express powers of the Constitution, contrary to its express language, contrary to the construction put upon it by a series of unbroken adjudications of the supreme and final arbiter appointed by its own provisions.

It will be observed that the language of the second section of this amendment, "*to enforce this article by appropriate legislation,*" is not near so comprehensive as is the language of the 18*th subdivision of section* 8, *article* 1, *United States Constitution,* which follows the enumeration of the powers of Congress specified in the preceding subdivisions, and declares that the Congress shall have power "*to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or any officer or department thereof.*" Yet this has been uniformly construed by the supreme court of the United States to confer no new power upon the government or Congress, but simply to declare the legislative power in it to carry out the express grants of the Constitution, and such as were necessarily implied therein, and nothing more. Of course this second section of the amendment must have the same construction. Its whole meaning, then, is, that Congress has the legislative authority to abolish slavery, nothing more. Then seeing a total want of constitutional authority in Congress to enact such

Bowlin vs. Commonwealth.

laws for the regulation of the domestic concerns of the States, or to control its courts or officers in the administration of the State laws, it is rational to conclude they did not so intend, and, if they desired to indulge in measures which may produce such absurd results within the sovereignty of the national government, there can be no reason why these measures should be introduced within the sovereignty of the States, and especially by its officers and agents, either through a principle of comity or otherwise.

The admission of George Gardner to testify was in violation of the laws of Kentucky, which are not repealed or modified by the civil rights bill, and, indeed, cannot be by any act of Congress.

The judgment of conviction should therefore be reversed, with directions to the court not to admit said Gardner to testify on another trial, should the defendant object thereto; and for these reasons I concur with the majority in a reversal.