KAHN & WOLF *v.* A. GOODHART ET AL.

[Abstract Kentucky Law Reporter, Vol. 3—615.]

**Attachment for Fraud in the Sale of a Grocery.**

When a sale of a grocery is made by its owner, who does not pay his creditors, and the fact is shown that such sale was made without any change of possession from the seller to the buyer, it is fraudulent and void as to the seller's creditors, and they may attach the property and subject it to the payment of their claims.

APPEAL FROM McCRACKEN COURT OF COMMON PLEAS.

February 4, 1882.

OPINION BY JUDGE HARGIS:

The appellants, after obtaining judgment and return of no property found, instituted this action in equity to subject, amongst other property, a family grocery containing $1,000 worth of goods, alleged to belong to A. Goodhart. An attachment was levied on the goods on the 10th of July, 1871, and the appellee, Melber, claiming the goods as his own, executed a forthcoming bond for their agreed value. Goodhart and Melber answered the petition, each alleging substantially that Goodhart had sold and received the consideration for the goods on the 24th of May, 1871, from the appellee, Melber, and that the attachment was wrongfully levied upon them. Judgment was rendered discharging the attachment and cancelling Melber's bond, and the appellants have appealed from that judgment.

The only question involved is, Did Melber in good faith purchase the goods from Goodhart? For some years before the 24th of May, 1871, Goodhart had been carrying on the grocery business in the same house in which the goods were kept that he and Melber claims were sold by the former to the latter. From the 24th of May, 1871, until Melber sold out, as he alleges, in December following to a man whose deposition is not taken and his whereabouts not shown, no visible change of possession or control of the goods and house is shown to have taken place. Goodhart's sign hung above the door. He and his son conducted the business, and some of the purchases to replenish the stock are shown to have been made by Goodhart and made in his own

proper name. Persons who dealt there and closed their bills by the week knew nothing of the alleged sale or change of ownership. None of the customers who bought goods at his grocery, nor any of the wholesale dealers of whom the goods were purchased to keep up its stock, ever saw Melber in general or special control of any part of the concern or recognized him in any way as being connected with it.

Melber and Goodhart swear that after the latter was burned out some four years prior to said May 24, the former loaned him $400 without security and took his note for it; again, immediately after his grocery was burned the second time, he loaned him $500 on the same terms and in the same manner; that Melber never asked Goodhart for the money on these notes and nothing was said about their payment out of the purchase-price of the grocery until after Goodhart had sold it to him; that then the two notes aggregating $900 were deducted from the agreed price and Melber paid the remainder thereof, it being $463, to Goodhart in cash. The latter testifies that the cash was paid three days after the sale, and the former says that it was paid on the day of sale.

The two promissory notes were not proven to have been surrendered, lost or destroyed, and their nonproduction adds some weight to the charge of fraud, as their production and genuineness, if shown, would have furnished strong evidence of the honesty of the transaction.

It is an unusual thing for a man like Melber, owning a little $800 farm eight miles away in the country, where he lived and carried on farming and marketing in a small way on an estate assessed by himself in 1870 and 1871 at less than $1,300, without any experience in merchandising, to buy, on the spur of the occasion, a grocery at a price greater than his whole estate as valued by himself and still live and conduct this farm as he had done aforetime, while the grocery business altered not in its course or apparent ownership. Connected with all these circumstances and badges of fraud, he only held the grocery long enough to rid himself of the goods through the agency of Goodhart & Son, and then sold out to a person "non est" and forever quit his new occupation for which he neither had taste, experience nor capital to maintain.

The facts of this case show preparation, agreement and a most

consummate device to cover up the goods from the reach of Goodhart's creditors. But in their very perfection and apparent consistency lurks their own destruction. For by their deceitful appearances the appellees were misled by the belief that they would sustain their conduct, and trusting to the formal completion of the contract of sale, Goodhart was permitted to proceed with his business as if nothing had happened so far as the knowledge of the public was concerned.

"It is a well-settled principle," says this court in *Steir v. Robinson,* 2 Bush (Ky.) 30, "applicable to private sales of personal property, that where such sales are made without any change of possession from the seller to the buyer, they are fraudulent and void as to creditors." The residence of the vendee with the vendor at the time of sale will not take such a case out of the operation of this rule of law. In this case, instead of residing with the vendor, at most the vendee visited the vendor on Saturday nights and stayed all night a few times.

See the cases of *Halbert v. Grant,* 4 T. B. Mon. (Ky.) 580, and *Waller v. Cralle,* 8 B. Mon. (Ky.) 11, which are cited in the case mentioned and fully sustain the doctrine therein laid down.

Wherefore the judgment is *reversed* and cause remanded with directions to render judgment in conformity to the principles of this opinion.

*W. P. D. Bush, I. & J. Caldwell, for appellants.*