## EX PARTE VIRGINIA.

1. A., a judge of a county court in Virginia, charged by the law of that State
   with the selection of jurors to serve for the year 1878 in the circuit and
   county courts of his county, was, in the District Court of the United States
   for the Western District of Virginia, indicted for excluding and failing to
   select as grand jurors and petit jurors certain citizens of his county, of
   African race and black color, who, possessing all other qualifications pre-
   scribed by law, were excluded from the jury lists made out by him as
   such officer, on account of their race, color, and previous condition of servi-
   tude, and for no other reason, against the peace, &c., of the United States,
   and against the form of the statute in such case made and provided.  Being
   in custody under that indictment, he presented to this court his petition for
   a writ of *habeas corpus* and a writ of *certiorari* to bring up the record of the
   inferior court, that he might be discharged, averring that the finding of
   the indictment, and his arrest and imprisonment thereunder, were unwar-
   ranted by the Constitution of the United States, in violation of his rights
   and the rights of the State of Virginia, whose judicial officer he is, and
   that the inferior court had no jurisdiction to proceed against him.  A simi-
   lar petition was presented by Virginia.  *Held*, that while a writ of *habeas-
   corpus* cannot generally be made to subserve the purposes of a writ of error,
   yet when a prisoner is held without any lawful authority, and by an order
   which an inferior court of the United States had no jurisdiction to make,
   this court will, in favor of liberty, grant the writ, not to review the whole
   case, but to examine the authority of the court below to act at all.

2. The section of the act entitled "An Act to protect all citizens in their civil
   and legal rights," approved March 1, 1875 (18 Stat., part 3, 336), which
   enacts that "no citizen, possessing all other qualifications which are or may
   be prescribed by law, shall be disqualified from service as grand or petit
   juror in any court of the United States, or of any State, on account of race,
   color, or previous condition of servitude; and any officer or other person,
   charged with any duty in the selection or summoning of jurors, who shall
   exclude or fail to summon any citizen for the cause aforesaid, shall, on
   conviction thereof, be deemed guilty of a misdemeanor, and be fined not
   more than $5,000," examined, and *held* to be authorized by the Thirteenth
   and Fourteenth Amendments of the Constitution.

3. The inhibition contained in the Fourteenth Amendment means that no agency·
   of the State, or of the officers or agents by whom her powers are exerted,
   shall deny to any person within her jurisdiction the equal protection of the
   laws.  Whoever by virtue of his public position under a State government
   deprives another of life, liberty, or property, without due process of law, or
   denies or takes away the equal protection of the laws, violates that inhibi-
   tion; and as he acts in the name of and for the State, and is clothed with
   her power, his act is her act.  Otherwise, the inhibition has no mean-
   ing, and the State has clothed one of her agents with power to annul
   evade it.

4. That amendment was ordained to secure equal rights to all persons.
   render its purpose effectual, Congress is vested with power to enforce

provisions by appropriate legislation. Such legislation must act, not upon the abstract thing denominated a State, but upon the persons who are its agents in the denial of the rights which were intended to be secured. Such is said act of March 1, 1875, and it is fully authorized by the Constitution.

5. The act of A. in selecting jurors was ministerial, not judicial, and, although he derived his authority from the State, he was bound, in the discharge of that duty, to obey the Federal Constitution and the laws passed in pursuance thereof.

PETITION for a writ of *habeas corpus*.

The facts are stated in the opinion of the court.

*Mr. James G. Field*, Attorney-General of Virginia, and *Mr. William J. Robertson* for the petitioner.

*Mr. Attorney-General Devens* and *Mr. Assistant Attorney-General Smith*, *contra*.

MR. JUSTICE STRONG delivered the opinion of the court.

The petitioner, J. D. Coles, was arrested, and he is now held in custody under an indictment found against him in the District Court of the United States for the Western District of Virginia. The indictment alleged that he, being a judge of the county court of Pittsylvania County of that State, and an officer charged by law with the selection of jurors to serve in the circuit and county courts of said county in the year 1878, did then and there exclude and fail to select as grand and petit jurors certain citizens of said county of Pittsylvania, of African race and black color, said citizens possessing all other qualifications prescribed by law, and being by him excluded from the jury lists made out by him as such judge, on account of their race, color, and previous condition of servitude, and for no other reason, against the peace and dignity of the United States, and against the form of the statute of the United States in such case made and provided.

Being thus in custody, he has presented to us his petition for a writ of *habeas corpus* and a writ of *certiorari* to bring up the record of the District Court, in order that he may be discharged; and he avers that the District Court had and has no jurisdiction of the matters charged against him in said indictment; that they constitute no offence punishable in said District Court; and that the finding of said indictment, and his consequent

arrest and imprisonment, are unwarranted by the Constitution of the United States, or by any law made in pursuance thereof, and are in violation of his rights and of the rights of the State of Virginia, whose judicial officer he is.

A similar petition has been presented by the State of Virginia, praying for a *habeas corpus* and for the discharge of the said Coles. Accompanying both these petitions are exhibited copies of the indictment, the bench-warrant, and the return of the marshal, showing the arrest of the said Coles and his detention in custody.

Both these petitions have been considered as one case, and the first question they present is, whether this court has jurisdiction to award the writ asked for by the petitioners. The question is not free from difficulty, in view of the Constitution and the several acts of Congress relating to writs of *habeas corpus*, and in view of our decisions heretofore made. If granting the writ would be an exercise of original jurisdiction, it would seem that it could not be granted, unless the fact that one of the petitioners for the writ is the State of Virginia makes the cases to differ. This is established by the rulings in *Marbury* v. *Madison* (1 Cranch, 137), and in numerous subsequent decisions. And it is not readily perceived how the fact that a State applies for the writ to be directed to one of her own citizens can make a case for our original jurisdiction.

But the appellate power of this court is broader than its original, and generally — that is, in most cases — it may be said that the issue of a writ of *habeas corpus* by us, when it is directed to one of our inferior courts, is an exercise of our appellate jurisdiction. Without going at large into a discussion of its extent, it is sufficient for the present to notice the fact that the exercise of the appellate power is not limited by the Constitution to any particular form or mode. It is not alone by appeal or by writ of error that it may be invoked. In the *Matter of Metzer* (5 How. 176), it was indeed ruled that an order of commitment made by a district judge, *at chambers*, cannot be revised here by *habeas corpus*. But such an order was reviewable in no form; and, besides, the authority of that case has been much shaken. *In re Kaine*, 14 How. 103; *Ex*

*parte Yerger*, 8 Wall. 85.   In the latter of these cases, it was said by Chief Justice Chase, in delivering the opinion of the court: " We regard as established, upon principle and authority, that the appellate jurisdiction by *habeas corpus* extends to all cases of commitment by the judicial authority of the United States, not within any exception made by Congress."

In the present case, the petitioner Coles is in custody under a bench-warrant directed by the District Court, and the averment is that the court had no jurisdiction of the indictment on which the warrant is founded.

The District Court is an inferior court, and, in such a case as that exhibited by the indictment, its judgments are reviewable here.   The indictment has been found for a violation of sect. 4 of the act of Congress of March 1, 1875, entitled " An Act to protect all citizens in their civil and legal rights."   18 Stat., part 3, 336.   The third section gives to the district courts as well as the circuit judicial cognizance of all offences against the provisions of the act; and the fifth section enacts that all cases arising under the provisions of the act shall be reviewable by the Supreme Court of the United States, without regard to the sum in controversy, under the same provisions and regulations as are now provided by law for the review of other cases in said court.   If this section applies to criminal cases as well as civil, our appellate power extends directly to the District Court, and the act of March 3, 1879 (20 Stat. 354), which allows writs of error to the Circuit Court in such cases, has not deprived us of appellate jurisdiction.

We have, then, an application to our appellate power over the action of a district court, in a case where it is alleged that court has acted outside of its jurisdiction.   It is said there is nothing to appeal from, that no decision or judgment has been given in the inferior court, and that the appeal, if any, is taken from the finding of a grand jury.   This is a mistake.   The bench-warrant was an order of the court, and the validity of the bench-warrant is the matter in question.   It is true there has been no final judgment or decision of the whole case; but an appeal may lie, and in many courts often does lie, from a merely interlocutory order. It is said no *habeas corpus* was sued out either in the district or circuit court, and that we are not called upon to review the

action of a lower court upon such a writ. This is true, and such a writ from the lower court would have been a more regular proceeding. We cannot say, however, it was indispensable, especially in view of the fact that a State is seeking release of one of her officers, and in view of former action in this court. In *Ex parte Hamilton* (3 Dall. 17), this court awarded a writ of *habeas corpus*, to review a commitment under a warrant of a district judge. *In Ex parte Burford* (3 Cranch, 448), such a writ was awarded to review a commitment by the Circuit Court of the District of Columbia, not to review a decision of an inferior court upon a *habeas corpus* issued by it. So, in *Ex parte Jackson* (96 U. S. 727), in which the question of our power to issue the writ was raised, and the petition only averred that the Circuit Court had exceeded its jurisdiction, this court considered the merits of the case, without regard to the fact that there had been no *habeas corpus* in the court below. And in *Ex parte Lange* (18 Wall. 163) it was ruled, after an examination of authorities, that when a prisoner shows that he is held under a judgment of a Federal court, given without authority of law, this court, by writs of *habeas corpus* and *certiorari*, will look into the record, so far as to ascertain whether that is the fact, and, if it is found to be so, will discharge him. Mr. Justice Miller said, in delivering the opinion: "The authority of the court in such a case, under the Constitution of the United States, and the fourteenth section of the Judiciary Act of 1789, to issue this writ and to examine the proceedings in the inferior court, so far as may be necessary to ascertain whether that court has exceeded its authority, is no longer an open question."

While, therefore, it is true that a writ of *habeas corpus* cannot generally be made to subserve the purposes of a writ of error, yet when a prisoner is held without any lawful authority, and by an order beyond the jurisdiction of an inferior Federal court to make, this court will, in favor of liberty, grant the writ, not to review the whole case, but to examine the authority of the court below to act at all.

Our conclusion, then, is that we are empowered to grant the writ in such a case as is presented in these petitions. We come now to the merits of the case.

The indictment and bench-warrant, in virtue of which the petitioner Coles has been arrested and is held in custody, have their justification, — if any they have, — in the act of Congress of March 1, 1875, sect. 4. 18 Stat., part 3, 336. That section enacts that "no citizen, possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than $5,000." The defendant has been indicted for the misdemeanor described in this act, and it is not denied that he is now properly held in custody to answer the indictment, if the act of Congress was warranted by the Constitution. The whole merits of the case are involved in the question, whether the act was thus warranted.

The provisions of the Constitution that relate to this subject are found in the Thirteenth and Fourteenth Amendments. The Thirteenth ordains that "neither slavery nor involuntary servitude, except as punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction," and it declares that Congress shall have power to enforce the article by appropriate legislation. This has been followed by the Fourteenth Amendment, which ordains that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person the equal protection of the laws." This amendment also declares that "the Congress shall have power to enforce by appropriate legislation the provisions of this article."

One great purpose of these amendments was to raise the

colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression by law because of race or color. They were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress. They are to some extent declaratory of rights, and though in form prohibitions, they imply immunities, such as may be protected by congressional legislation. We had occasion in the *Slaughter-House Cases* (16 Wall. 27) to express our opinion of their spirit and purpose, and to some extent of their meaning. We have again been called to consider them in *Tennessee* v. *Davis* (*supra*, p. 257) and *Strauder* v. *West Virginia, supra,* p. 303. In this latter case we held that the Fourteenth Amendment secures, among other civil rights, to colored men, when charged with criminal offences against a State, an impartial jury trial, by jurors indifferently selected or chosen without discrimination against such jurors because of their color. We held that immunity from any such discrimination is one of the equal rights of all persons, and that any withholding it by a State is a denial of the equal protection of the laws, within the meaning of the amendment. We held that such an equal right to an impartial jury trial, and such an immunity from unfriendly discrimination, are placed by the amendment under the protection of the general government and guaranteed by it. We held, further, that this protection and this guarantee, as the fifth section of the amendment expressly ordains, may be enforced by Congress by means of appropriate legislation.

All of the amendments derive much of their force from this latter provision. It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective. Whatever legislation is appro-

priate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

Nor does it make any difference that such legislation is restrictive of what the State might have done before the constitutional amendment was adopted. The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial. Such enforcement is no invasion of State sovereignty. No law can be, which the people of the States have, by the Constitution of the United States, empowered Congress to enact. This extent of the powers of the general government is overlooked, when it is said, as it has been in this case, that the act of March 1, 1875, interferes with State rights. It is said the selection of jurors for her courts and the administration of her laws belong to each State ; that they are her rights. This is true in the general. But in exercising her rights, a State cannot disregard the limitations which the Federal Constitution has applied to her power. Her rights do not reach to that extent. Nor can she deny to the general government the right to exercise all its granted powers, though they may interfere with the full enjoyment of rights she would have if those powers had not been thus granted. Indeed, every addition of power to the general government involves a corresponding diminution of the governmental powers of the States. It is carved out of them.

We have said the prohibitions of the Fourteenth Amendment are addressed to the States. They are, " No *State* shall make or enforce a law which shall abridge the privileges or immunities of citizens of the United States, . . . nor deny to any person within its jurisdiction the equal protection of the laws." They have reference to actions of the political body denominated a State, by whatever instruments or in whatever

modes that action may be taken. A State acts by its legisla-
tive, its executive, or its judicial authorities. It can act in no
other way. The constitutional provision, therefore, must mean
that no agency of the State, or of the officers or agents by
whom its powers are exerted, shall deny to any person within
its jurisdiction the equal protection of the laws. Whoever, by
virtue of public position under a State government, deprives
another of property, life, or liberty, without due process of
law, or denies or takes away the equal protection of the
laws, violates the constitutional inhibition ; and as he acts in
the name and for the State, and is clothed with the State's
power, his act is that of the State. This must be so, or
the constitutional prohibition has no meaning. Then the
State has clothed one of its agents with power to annul or to
evade it.

But the constitutional amendment was ordained for a pur-
pose. It was to secure equal rights to all persons, and, to insure
to all persons the enjoyment of such rights, power was given to
Congress to *enforce* its provisions by appropriate legislation.
Such legislation must act upon persons, not upon the abstract
thing denominated a State, but upon the persons who are the
agents of the State in the denial of the rights which were in-
tended to be secured. Such is the act of March 1, 1875, and
we think it was fully authorized by the Constitution.

The argument in support of the petition for a *habeas corpus*
ignores entirely the power conferred upon Congress by the
Fourteenth Amendment. Were it not for the fifth section of
that amendment, there might be room for argument that the
first section is only declaratory of the moral duty of the State,
as was said in *Commonwealth of Kentucky* v. *Dennison*, 24
How. 66. The act under consideration in that case provided
no means to compel the execution of the duty required by it,
and the Constitution gave none. It was of such an act Mr.
Chief Justice Taney said, that a power vested in the United
States to inflict any punishment for neglect or refusal to per-
form the duty required by the act of Congress " would place
every State under the control and dominion of the general gov-
ernment, even in the administration of its internal concerns
and reserved rights." But the Constitution now expressly

gives authority for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment. It is but a limited authority, true, extending only to a single class of cases; but within its limits it is complete. The remarks made in *Kentucky* v. *Dennison* and in *Collector* v. *Day*, though entirely just as applied to the cases in which they were made, are inapplicable to the case we have now in hand.

We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience.

It was insisted during the argument on behalf of the petitioner that Congress cannot punish a State judge for his official acts; and it was assumed that Judge Cole, in selecting the jury as he did, was performing a judicial act. This assumption cannot be admitted. Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. It often is given to county commissioners, or supervisors, or assessors. In former times, the selection was made by the sheriff. In such cases, it surely is not a judicial act, in any such sense as is contended for here. It is merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads. That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?

But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts

penalties upon State judges for their judicial action. It does no such thing.

Upon the whole, as we are of opinion that the act of Congress upon which the indictment against the petitioner was founded is constitutional, and that he is correctly held to answer it, and as, therefore, no object would be secured by issuing a writ of *habeas corpus,* the petitions are

*Denied.*

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE CLIFFORD, dissenting.

I dissent from the judgment of the court in this case, and from the reasons by which it is supported ; and I will state the grounds of my dissent.

In Virginia, all male citizens between the ages of twenty-one and sixty, who are entitled to vote and hold office under the Constitution and laws of the State, are liable, with certain exceptions not material to be here mentioned, to serve as jurors. The judge of each county or corporation court is required to prepare annually a list of such inhabitants of the county or corporation, not less than one hundred, nor exceeding three hundred in number, " as he shall think well qualified to serve as jurors, being persons of sound judgment and free from legal exception." The name of each person on the list thus prepared is to be written on a separate ballot, and placed in a box to be kept by the clerk of the court. From this box the names of persons to be summoned as grand and petit jurors of the county are to be drawn.

The law, in thus providing for the preparation of the list of persons from whom the jurors are to be taken, makes no discrimination against persons of the colored race. The judge of the county or corporation court is restricted in his action only by the condition that the persons selected shall, in his opinion, be " well qualified to serve as jurors," be " of sound judgment," and " free from legal exception." Whether they possess these qualifications is left to his determination ; and, as I shall attempt hereafter to show, for the manner in which he discharges this duty he is responsible only to the State whose officer he is and whose law he is bound to enforce.

The petitioner, J. D. Coles, is the judge of the county court of the county of Pittsylvania, in Virginia, and has held that office for some years. It is not pretended that, in the discharge of his judicial duties, he has ever selected as jurors persons who were not qualified to serve in that character, or who were not of sound judgment, or who were not free from legal exception. It is not even suggested in argument that he has not at all times faithfully obeyed the law of the State; yet he has been indicted in the District Court of the United States for the Western District of Virginia for having, on some undesignated day in the year 1878, excluded and failed to select as grand and petit jurors citizens of the county, on account of race, color, and previous condition of servitude. The indictment does not state who those citizens were, or set forth any particulars of the offence, but charges it in the general words of a definition. The District Court, nevertheless, issued a bench-warrant, upon which the judge was arrested, and, refusing to give bail, he is held in custody to answer the indictment. He therefore petitions for a *certiorari* to that court to send up the record of its proceedings for our examination, and for a writ of *habeas corpus*, alleging that its action was without jurisdiction, and that his imprisonment thereunder is unlawful; and he prays to be released therefrom.

The Commonwealth of Virginia has also presented a similar petition, declaring that she is injured by being deprived of the services of her judicial officer, by his unlawful arrest and imprisonment.

If the District Court had no jurisdiction, as alleged, of the matters charged against the county judge, if they constitute no public offence for which he could be held, his arrest and imprisonment upon process issued upon the indictment were unlawful, and his petition should be granted.

It has been settled by this court upon full examination, and after some conflict of opinion among its members, that the writ of *habeas corpus* is a mode provided for the exercise of its appellate jurisdiction, whenever by any unauthorized action of an inferior tribunal, whether it be by its order, decree, or process, a citizen is restrained of his personal liberty; and that a *certiorari* will issue in connection with the writ, to bring up

the record of the inferior tribunal for examination. In such cases this court will look into the record, to determine not whether the inferior tribunal has erred in its action, but whether it has exceeded its jurisdiction in the imprisonment of the petitioner. *Ex parte Yerger*, 8 Wall. 85 ; *Ex parte Lange*, 18 id. 166.

The indictment is founded upon the fourth section of the act of Congress of March 1, 1875, " to protect all citizens in their civil and legal rights," which declares, " That no citizen possessing all other qualifications, which are or may be prescribed by law, shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude ; and any officer or other person charged with any duty in the selection or summoning of jurors, who shall exclude or fail to summon any citizen for the cause aforesaid, shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than $5,000."

In what I have to say, I shall endeavor to show that the District Court in issuing its process for the arrest of the defendant, and in imprisoning him, exceeded its jurisdiction : 1st, because, assuming that the act of 1875 is constitutional and valid legislation, the indictment describes no offence under it, but is void on its face ; and, 2d, because that act in the section cited, so far as it relates to jurors in the State courts, is unconstitutional and void.

The indictment merely repeats the general language of the statute. It avers that the defendant, being judge of Pittsylvania County, and an officer charged by law with the selection of jurors to serve in the circuit and county courts of the county, excluded and failed to select as jurors, on account of race, color, and previous condition of servitude, certain citizens of the county possessing all other qualifications prescribed by law ; but it names no citizens who were thus excluded, and, of course, designates no specific traversable offence. It is essential to a valid indictment that it should set forth the offence, with such particulars of time, place, and person, that the accused may know the nature of the charge, and be able to prepare to meet it. It is not enough to repeat the definition of the offence in the general language of the statute, and then

aver that the defendant has been guilty of the offence thus defined, without other specification.   It is not sufficient, for example, to charge in an indictment that the defendant has been guilty of murder, without stating the time and place of the offence, and the name of the person murdered, or, if his name be unknown, giving such a description as to identify him. An indictment without such specification would be merely a collection of pointless words.   This doctrine is only common learning; it is found in the hornbooks of the law; it is on the pages thumbed by the student in his first lessons in criminal procedure.

The Constitution, in its sixth amendment, strikes with nullity all such vague accusations as are embraced in this indictment.   It declares, repeating in this respect the doctrine of the common law, that, in all criminal prosecutions, the accused shall "be informed of the nature and cause of the accusation" against him; and this means that all the essential ingredients of the offence charged must be stated, embracing, with reasonable certainty, the particulars of time, place, and person or property.   It is only by such information that the accused will be enabled to prepare his defence, and avail himself of his acquittal or conviction against any further prosecution for the same cause. "This principle," says Bishop in his treatise, "that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted, pervades the entire system of the adjudged law of criminal procedure.   It is not made apparent to our understandings by a single case only, but by all the cases.   Wherever we move in this department of our jurisprudence, we come in contact with it.   We can no more escape from it than from the atmosphere which surrounds us."   Sect. 81. To the same effect is the language of Archbold, in his treatise on Criminal Practice and Pleading.   "The indictment," he says, "must state all the facts and circumstances comprised in the definition of the offence, by the rule of the common law or statute on which the indictment is founded.   And these must be stated with clearness and certainty, otherwise the indictment will be bad."   And he states that the principal rule as to the certainty required in an indictment may be laid down thus: "That where the definition of an offence, whether by a rule

of the common law or by statute, includes generic terms (as it necessarily must), it is not sufficient that the indictment should charge the offence in the same generic terms as in the definition, but it must state the species, — it must descend to particulars. p. 88. This doctrine is fully stated and illustrated in the *Cruikshank Case*, both in the prevailing and dissenting opinion. 92 U. S. 558, 568. Tested by it, the indictment here is but a string of words, presenting no specific offence, and, therefore, not justifying the issue of any process for the arrest and imprisonment of the petitioner.

It is difficult to understand how an indictment so defective could have been drawn by the public prosecutor, unless we accept, as an explanation of it, the extraordinary statement of counsel, that the district judge instructed the grand jury to the effect, that whenever it appeared that a State judge, in discharging the duty imposed on him by the law of the State to prepare annually a list of such inhabitants of his county as he should " think well qualified to serve as jurors, being persons of sound judgment and free from legal exception," had never put colored persons on the jury lists, it was to be presumed that his failure to do so was because of their race, color, or previous condition of servitude, and that it was the duty of the grand jury to indict him for that offence. In the face of this ruling no defence could be made by the accused, although he may have exercised at all times his best judgment in the selection of qualified persons, unless he could prove, what in most cases would be impossible, that in a county of many thousand inhabitants there was not a colored person qualified to serve as a juror. With this ruling there could be no necessity of alleging in the indictment any thing beyond the general failure to put colored persons on the jury list, — a fact which could not be disputed ; and it would sufficiently inform the accused that he must be prepared, in order to rebut the presumption of guilt, to prove that there were no persons of the colored race in the county qualified to act as jurors. It is difficult to speak of this ruling in the language of moderation.

My second position is that the fourth section of the act of 1875, so far as it applies to the selection of jurors in the State courts, is unconstitutional and void. Previous to the late

amendments, it would not have been contended, by any one familiar with the Constitution, that Congress was vested with any power to exercise supervision over the conduct of State officers in the discharge of their duties under the laws of the State, and prescribe a punishment for disregarding its directions. It would have been conceded that the selection of jurors was a subject exclusively for regulation by the States that it was for them to determine who should act as jurors in their courts, from what class they should be taken, and what qualifications they should possess; and that their officers in carrying out the laws in this respect were responsible only to them. The States could have abolished jury trials altogether, and required all controversies to be submitted to the courts without their intervention. The Sixth and Seventh Amendments, in which jury trials are mentioned, apply only to the Federal courts, as has been repeatedly adjudged.

The government created by the Constitution was not designed for the regulation of matters of purely local concern. The States required no aid from any external authority to manage their domestic affairs. They were fully competent to provide for the due administration of justice between their own citizens in their own courts ; and they needed no directions in that matter from any other government, any more than they needed directions as to their highways and schools, their hospitals and charitable institutions, their public libraries, or the magistrates they should appoint for their towns and counties. It was only for matters which concerned all the States, and which could not be managed by them in their independent capacity, or managed only with great difficulty and embarrassment, that a general and common government was desired. Whilst they retained control of local matters, it was felt necessary that matters of general and common interest, which they could not wisely and efficiently manage, should be intrusted to a central authority. And so to the common government which grew out of this prevailing necessity was granted exclusive jurisdiction over external affairs, including the great powers of declaring war, making peace, and concluding treaties ; but only such powers of internal regulation were conferred as were essential to the successful and efficient working of the govern-

ment established, — to facilitate intercourse and commerce between the people of the different States, and secure to them equality of protection in the several States.

That the central government was created chiefly for matters of a general character, which concerned all the States and their people, and not for matters of interior regulation, is shown as much by the history of its formation as by the express language of the Constitution. The Union preceded the Constitution. As happily expressed by the late Chief Justice, "It began among the colonies, and grew out of common origin, mutual sympathies, kindred principles, similar interests, and geographical relations. It was confirmed and strengthened by the necessities of war, and received definite form and character and sanction from the Articles of Confederation." *Texas* v. *White*, 7 Wall. 725. Those articles were prepared by the Continental Congress, which was called to provide measures for the common defence of the colonies against the encroachments of the British crown, and which, failing to secure redress, declared their independence. Its members foresaw that, when the independence of the colonies was established and acknowledged, their condition as separate and independent States would be beset with dangers threatening their peace and safety; that disputes arising from conflicting interests and rivalries, always incident to neighboring nations, would lead to armed collisions, and expose them to reconquest by the mother country. To provide against the possibility of evils of this kind, the Articles of Confederation were prepared and submitted to the legislatures of the several States, and finally, in 1781, were adopted. They declared that the States entered into a firm league of friendship with each other for their common defence; the security of their liberties and their mutual and general welfare; and they bound themselves to assist each other against attacks on account of religion, sovereignty, trade, or any other pretence. They clothed the new government created by them with powers supposed to be ample to secure these ends, and declared that there should be freedom of intercourse and commerce between the inhabitants of the several States. They provided for a general congress, and, among other things, invested it with the exclusive power of determining on peace and

war, except in case of invasion of a State by enemies, or imminent danger of such invasion by Indians; of sending and receiving ambassadors, entering into treaties and alliances; of regulating the alloy and value of coin struck by the authority of the States or of the United States; of fixing the standard of weights and measures; of regulating the trade and managing all affairs with the Indians; and of establishing and regulating post-offices from one State to another; and they placed numerous restraints upon the States. But by none of the articles was any interference authorized with the purely internal affairs of the States, or with any of the instrumentalities by which the States administered their governments and dispensed justice among their people; and they declared in terms that each State retained its sovereignty, freedom, and independence, and every power, jurisdiction, and right which was not by the articles expressly delegated to the United States in Congress assembled.

When the government of the confederation failed, chiefly through the want of all coercive authority, to carry into effect its measures, — its power being only that of recommendation to the States, — and the present Constitution was adopted, the same general ends were sought to be attained; namely, the creation of a central government, which would take exclusive charge of all our foreign relations, representing the people of all the States in that respect as one nation, and would at the same time secure at home freedom of intercourse between the States, equality of protection to citizens of each State in the several States, uniformity of commercial regulations, a common currency, a standard of weights and measures, one postal system, and such other matters as concerned all the States and their people.

Accordingly, the new government was invested with powers adequate to the accomplishment of these purposes, with which it could act directly upon the people, and not by recommendation to the States, and enforce its measures through tribunals and officers of its own creation. There were also restraints placed upon the action of the States to prevent interference with the authority of the new government, and to secure to all persons protection against punishment by legislative decree,

and insure the fulfilment of contract obligations. But the control of matters of purely local concern, not coming within the scope of the powers granted or the restraints mentioned, was left, where it had always existed, with the States. The new government being one of granted powers, its authority was limited by them and such as were necessarily implied for their execution. But lest, from a misconception of their extent, these powers might be abused, the Tenth Amendment was at an early day adopted, declaring that " the powers not delegated to the United States by the Constitution nor prohibited by it to the States are reserved to the States respectively, or to the people."

Now, if we look into the Constitution, we shall not find a single word, from its opening to its concluding line, nor in any of the amendments in force before the close of the civil war, nor, as I shall hereafter endeavor to show, in those subsequently adopted, which authorizes any interference by Congress with the States in the administration of their governments, and the enforcement of their laws with respect to any matter over which jurisdiction was not surrendered to the United States. The design of its framers was not to destroy the States, but to form a more perfect union between them, and, whilst creating a central government for certain great purposes, to leave to the States in all matters the jurisdiction of which was not sur rendered the functions essential to separate and independent existence. And so the late Chief Justice, speaking for the court in 1869, said : " Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States and the maintenance of their governments are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the national government ; " and then he adds, in that striking language which gives to an old truth new force and significance, that " the Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas* v. *White, supra.*

And Mr. Justice Nelson, also speaking for the court, in 1871, used this language : " The general government and the

States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme; but the States within the limits of their powers not granted, or, in the language of the Tenth Amendment, 'reserved,' are as independent of the general government as that government within its spheres is independent of the States." And again: " We have said that one of the reserved powers was that to establish a judicial department; it would have been more accurate, and in accordance with the existing state of things at the time, to have said the power to maintain a judicial department. All of the thirteen States were in the possession of this power, and had exercised it at the adoption of the Constitution; and it is not pretended that any grant of it to the general government is found in that instrument. It is, therefore, one of the sovereign powers vested in the States by their constitutions, which remained unaltered and unimpaired, and in respect to which the State is as independent of the general government as that government is independent of the States." *The Collector* v. *Day*, 11 Wall. 124–126.

The cases of *Texas* v. *White* and *The Collector* v. *Day* were decided after the Thirteenth and Fourteenth Amendments, upon which it is sought to maintain the legislation in question, were adopted; and with their provisions the Chief Justice and Mr. Justice Nelson, and the court for which they spoke, were familiar. Yet neither they, nor any other judge of the court, suggested that the doctrines announced in the opinions, from which I have quoted, were in any respect modified or affected by the amendments.

Nothing, in my judgment, could have a greater tendency to destroy the independence and autonomy of the States; reduce them to a humiliating and degrading dependence upon the central government; engender constant irritation; and destroy that domestic tranquillity which it was one of the objects of the Constitution to insure, — than the doctrine asserted in this case, that Congress can exercise coercive authority over judicial officers of the States in the discharge of their duties under State laws. It will be only another step in the same direction

towards consolidation, when it assumes to exercise similar coercive authority over governors and legislators of the States.

The Constitution declares that a " person charged in any State with treason, felony, or other crime, who shall flee from justice and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime." And yet in the case of *The Commonwealth of Kentucky* v. *Dennison*, where a fugitive from justice from Kentucky was demanded from the Governor of Ohio, and on his refusal application was made to this court for a *mandamus* to compel him to perform his duty in this respect, it was held that there was no clause or provision in the Constitution which armed the government of the United States with authority to compel the executive of a State to perform his duty, nor to inflict any punishment for his neglect or refusal. " Indeed, such a power," said Mr. Chief Justice Taney, speaking for the whole court, " would place every State under the control and dominion of the general government even in the administration of its internal concerns and reserved rights." 24 How. 107. And Mr. Justice Nelson, in the case of *Collector* v. *Day*, where it was held that it was not competent for Congress to impose a tax upon the salary of a judicial officer of a State, said, that " any government whose means employed in conducting its operations are made subject to the control of another and distinct government, can exist only at the mercy of that government." I could add to these authorities, if any thing more were required, that all the recorded utterances of the statesmen who participated in framing the Constitution and urging its adoption, and of the publicists and jurists who have since studied its language and aided in the enforcement of its provisions, are inconsistent with the pretension advanced in this case by the counsel of the government.

The duties of the county judge in the selection of jurors were judicial in their nature. They involved the exercise of discretion and judgment. He was to determine who were qualified to serve in that character, and for that purpose whether they possessed sound judgment, and were free from legal exceptions. The law under which he acted had been in

force for many years, and had been always considered by the judicial authorities of Virginia to be in conformity with its Constitution, which inhibits the legislature from requiring of its judges any other than judicial duties. A test as to the character of an act is found in the power of a writ of *mandamus*. to enforce its performance in a particular way. If the act be a judicial one, the writ can only require the judge to proceed in the discharge of his duty with reference to it; the manner of performance cannot be dictated. Here the writ could not command the county judge to select as jurors any particular persons, black or white, but only to proceed and select such as are qualified, — its command in that respect being subject to the limitation incident to all commands of such writs upon judicial officers touching judicial acts.

The Thirteenth and Fourteenth Amendments are relied upon, as already stated, to support the legislation in question. The Thirteenth Amendment declares " that neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The Fourteenth Amendment, in its first section, which is the only one having any bearing upon the questions involved in this case, declares that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." The Fifteenth Amendment, which declares that " the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State, on account of race, color, or previous condition of servitude," is not material to the question before us, except as showing that it was only with respect to the suffrage that an interdict was in terms placed against legislation on account of race, color, or previous condition of servitude. Equality in their civil rights was in other ways secured to persons of the colored

race ; and the ballot being assured to them, an effectual means against unjust legislation was placed in their hands. To each of these amendments a clause is added, authorizing Congress to enforce its provisions by "appropriate legislation."

The history of the amendments is fresh in the recollection of all of us. They grew out of the late civil war and the events which followed it. They were primarily designed to give freedom to persons of the African race, prevent their future enslavement, make them citizens, prevent discriminating State legislation against their rights as freemen, and secure to them the ballot. The generality of the language used necessarily extends some of their provisions to all persons of every race and color; but in construing the amendments and giving effect to them, the occasion of their adoption and the purposes they were designed to attain should be always borne in mind. Nor should it be forgotten that they are additions to the previous amendments, and are to be construed in connection with them and the original Constitution as one instrument. They do not, in terms, contravene or repeal any thing which previously existed in the Constitution and those amendments. Aside from the extinction of slavery, and the declaration of citizenship, their provisions are merely prohibitory upon the States and there is nothing in their language or purpose which indicates that they are to be construed or enforced in any way different from that adopted with reference to previous restraints upon the States. The provision authorizing Congress to enforce them by appropriate legislation does not enlarge their scope, nor confer any authority which would not have existed independently of it. No legislation would be appropriate which should contravene the express prohibitions upon Congress previously existing, as, for instance, that it should not pass a bill of attainder or an *ex post facto* law. Nor would legislation be appropriate which should conflict with the implied prohibitions upon Congress. They are as obligatory as the express prohibitions. The Constitution, as already stated, contemplates the existence and independence of the States in all their reserved powers. If the States were destroyed, there could, of course, be no United States. In the language of this court, in *The Collector* v. *Day*, "without them the general

government itself would disappear from the family of nations." Legislation could not, therefore, be appropriate which, under pretence of prohibiting a State from doing certain things, should tend to destroy it, or any of its essential attributes. To every State, as understood in the American sense, there must be, with reference to the subjects over which it has jurisdiction, absolute freedom from all external interference in the exercise of its legislative, judicial, and executive authority. Congress could not undertake to prescribe the duties of a State legislature and the rules it should follow, and the motives by which it should be governed, and authorize criminal prosecutions against the members if its directions were disregarded; for the independence of the legislature is essential to the independence and autonomy of the State. Congress could not lay down rules for the guidance of the State judiciary, and prescribe to it the law and the motives by which it should be controlled, and if these were disregarded, direct criminal proceedings against its members; because a judiciary independent of external authority is essential to the independence of the State, and also, I may add, to a just and efficient administration of justice in her courts. Congress could not dictate to the executive of a State the bills he might approve, the pardons and reprieves he might grant, or the manner in which he might discharge the functions of his office, and assume to punish him if its dictates were disregarded, because his independence, within the reserved powers, is essential to that of the State. Indeed, the independence of a State consists in the independence of its legislative, executive, and judicial officers, through whom alone it acts. If this were not so, a State would cease to be a self-existing and an indestructible member of the Union, and would be brought to the level of a dependent municipal corporation, existing only with such powers as Congress might prescribe.

I cannot think I am mistaken in saying that a change so radical in the relation between the Federal and State authorities, as would justify legislation interfering with the independent action of the different departments of the State governments, in all matters over which the States retain jurisdiction, was never contemplated by the recent amendments.

The people in adopting them did not suppose they were altering the fundamental theory of their dual system of governments. The discussions attending their consideration in Congress, and before the people, when presented to the legislatures of the States for adoption, can be successfully appealed to in support of this assertion. The Union was preserved at a fearful cost of life and property. The institution of slavery in a portion of the country was the cause of constant irritation and crimination between the people of the States where it existed and those of the free States, which finally led to a rupture between them and to the civil war. As the war progressed, its sacrifices and burdens filled the people of the loyal States with a determination, that not only should the Union be preserved, but that the institution which, in their judgment, had threatened its dissolution should be abolished. The emancipation proclamation of President Lincoln expressed this determination, though placed on the ground of military necessity. The Thirteenth Amendment carried it into the organic law. That amendment prohibits slavery and involuntary servitude, except for crime, within the United States, or any place subject to their jurisdiction. Its language is not restricted to the slavery of any particular class. It applies to all men ; and embraces in its comprehensive language not merely that form of slavery which consists in the denial of personal rights to the slave, and subjects him to the condition of a chattel, but also serfage, vassalage, peonage, villeinage, and every other form of compulsory service for the benefit, pleasure, or caprice of others. It was intended to render every one within the domain of the republic a freeman, with the right to follow the ordinary pursuits of life without other restraints than such as are applied to all others, and to enjoy equally with them the earnings of his labor. But it confers no political rights ; it leaves the States free, as before its adoption, to determine who shall hold their offices and participate in the administration of their laws. A similar prohibition of slavery and involuntary servitude was in the Constitution of several States previous to its adoption by the United States; and it was never held to confer any political rights.

On the 18th of December, 1865, this amendment was ratified,

that is, the official proclamation of its ratification was then
made; and in April of the following year the Civil Rights Act
was passed. Its first section declares that all persons born in
the United States, and not subject to any foreign power, ex-
cluding Indians not taxed, are "citizens of the United States,"
and that "such citizens, of every race and color, without regard
to any previous condition of slavery or involuntary servitude,
except as a punishment for crime, of which the party shall
have been duly convicted, shall have the same right in every
State and Territory in the United States, to make and enforce
contracts, to sue, be parties and give evidence, to inherit, pur-
chase, lease, sell, hold and convey real and personal property,
and to full and equal benefit of all laws and proceedings for
the security of person and property as is enjoyed by white
persons." This legislation was intended to secure to all per-
sons in the United States practical freedom. But its validity
was questioned in many quarters entitled to consideration, and
some of its provisions not long afterwards were declared by
State courts to be beyond the constitutional authority of Con-
gress. *Bowlin* v. *Commonwealth*, 2 Bush (Ky.), 15. There
were also complaints made that notwithstanding the amend-
ment abolishing slavery and involuntary servitude, except for
crime, the freedmen were, by legislation in some of the Southern
States, subjected to such burdensome disabilities in the acqui-
sition and enjoyment of property, and the pursuit of happiness,
as to render their freedom of little value. *Slaughter-House
Cases*, 16 Wall. 36. There were, besides, complaints of the
existence, in those sections, of a feeling of dislike towards
citizens of the North seeking residence there, and towards such
of their own citizens as had adhered to the national government
during the war, which could not fail to find expression in hostile
and discriminating legislation. It is immaterial whether these
complaints were justified or not; they were believed by many
persons to be well-founded. To remove the cause of them; to
obviate objections to the validity of legislation similar to that
contained in the first section of the Civil Rights Act; to pre-
vent the possibility of hostile and discriminating legislation in
future by a State against any citizen of the United States, and
the enforcement of any such legislation already had; and to

secure to all persons within the jurisdiction of the States the equal protection of the laws, — the first section of the Fourteenth Amendment was adopted. Its first clause declared who are citizens of the United States and of the States. It thus removed from discussion the question, which had previously been debated, and though decided, not settled, by the judgment in the *Dred Scott Case*, whether descendants of persons brought to this country and sold as slaves were citizens, within the meaning of the Constitution. It also recognized, if it did not create, a national citizenship, as contradistinguished from that of the States. But the privilege or the duty, whichever it may be called, of acting as a juror in the courts of the country, is not an incident of citizenship. Women are citizens; so are the aged above sixty, and children in their minority; yet they are not allowed in Virginia to act as jurors. Though some of these are in all respects qualified for such service, no one will pretend that their exclusion by law from the jury list impairs their rights as citizens.

The second clause of the first section of the amendment declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." In *Slaughter-House Cases*, it was held by a majority of the court that this clause had reference only to privileges and immunities of citizens of the United States, as distinguished from those of citizens of the States, and, therefore, did not apply to those fundamental civil rights which belong to citizens of all free governments, such as the right to acquire and enjoy property and pursue happiness, subject only to such just restraints as might be prescribed for the general good. If this construction be correct, there can be no pretence that the privilege or duty of acting as a juror in a State court is within the inhibition of the clause. Nor could it be within that inhibition if a broader construction were given to the clause, and it should be held, as contended by the minority of the court in *Slaughter-House Cases*, that it prohibits the denial or abridgment by any State of those fundamental privileges and immunities which of right belong to citizens of all free governments; and with which the Declaration of Independence proclaimed that all men were endowed by their Creator,

and to secure which governments were instituted among men. These fundamental rights were secured, previous to the amendment, to citizens of each State in the other States, by the second section of the fourth article of the Constitution, which declares that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Among those privileges and immunities it was never contended that jury duty or jury service was included.

. ·The third clause in the first section of the amendment declares that no State "·shall deprive any person of life, liberty, or property without due process of law." It will not be contended that this clause confers upon the citizen any right to serve as a juror in the State courts. It exists in the Constitution of nearly all the States, and is only an additional security against arbitrary deprivation of life and liberty, and arbitrary spoliation of property. It means that neither can be taken, or the enjoyment thereof impaired, except in the course of the regular administration of the law in the established tribunals. The existence of this clause in the amendment is to me a persuasive argument that those who framed it, and the legislatures of the States which adopted it, never contemplated that the prohibition was to be enforced in any other way than through the judicial tribunals, as previous prohibitions upon the States had always been enforced. If Congress could, as an appropriate means to enforce the prohibition, prescribe criminal prosecutions for its infraction against legislators, judges, and other officers of the States, it would be authorized to frame a vast portion of their laws ; for there are few subjects upon which legislation can be had besides life, liberty, and property. In determining what constitutes a deprivation of property, it might prescribe the conditions upon which property shall be acquired and held, and declare as to what subjects property rights shall exist. In determining what constitutes deprivation of liberty, it might prescribe in what way and by what means the liberty of the citizen shall be deemed protected. In prescribing punishment for deprivation of life, it might prescribe a code of criminal procedure. All this and much more might be done if it once be admitted, as the court asserts in this case, that Congress can authorize a criminal prosecution for the infraction

of the prohibitions. It cannot prescribe punishment without defining crime, and therefore must give expression to its own views as to what constitutes protection to life, liberty, and property.

The fourth clause in the first section of the amendment declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Upon this clause the counsel of the district judge chiefly rely to sustain the validity of the legislation in question. But the universality of the protection secured necessarily renders their position untenable. All persons within the jurisdiction of the State, whether permanent residents or temporary sojourners, whether old or young, male or female, are to be equally protected. Yet no one will contend that equal protection to women, to children, to the aged, to aliens, can only be secured by allowing persons of the class to which they belong to act as jurors in cases affecting their interests. The equality of protection intended does not require that all persons shall be permitted to participate in the government of the State and the administration of its laws, to hold its offices, or be clothed with any public trusts. As already said, the universality of the protection assured repels any such conclusion.

The equality of the protection secured extends only to civil rights as distinguished from those which are political, or arise from the form of the government and its mode of administration. And yet the reach and influence of the amendment are immense. It opens the courts of the country to every one, on the same terms, for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts; it assures to every one the same rules of evidence and modes of procedure; it allows no impediments to the acquisition of property and the pursuit of happiness, to which all are not subjected; it suffers no other or greater burdens or charges to be laid upon one than such as are equally borne by others; and in the administration of criminal justice it permits no different or greater punishment to be imposed upon one than such as is prescribed to all for like offences. It secures to all persons their civil rights upon the same terms; but it leaves political rights, or such as arise from the form of gov-

ernment and its administration, as they stood previous to its adoption. It has no more reference to them than it has to social rights and duties, which do not rest upon any positive law, though they are more potential in controlling the intercourse of individuals. In the consideration of questions growing out of these amendments much confusion has arisen from a failure to distinguish between the civil and the political rights of citizens. Civil rights are absolute and personal. Political rights, on the other hand, are conditioned and dependent upon the discretion of the elective or appointing power, whether that be the people acting through the ballot, or one of the departments of their government. The civil rights of the individual are never to be withheld, and may be always judicially enforced. The political rights which he may enjoy, such as holding office and discharging a public trust, are qualified because their possession depends on his fitness, to be adjudged by those whom society has clothed with the elective authority. The Thirteenth and Fourteenth Amendments were designed to secure the civil rights of all persons, of every race, color, and condition; but they left to the States to determine to whom the possession of political powers should be intrusted. This is manifest from the fact that when it was desired to confer political power upon the newly made citizens of the States, as was done by inhibiting the denial to them of the suffrage on account of race, color, or previous condition of servitude, a new amendment was required.

The doctrine of the district judge, for which the counsel contend, would lead to some singular results. If, when a colored person is accused of a criminal offence, the presence of persons of his race on the jury by which he is to be tried is essential to secure to him the equal protection of the laws, it would seem that the presence of such persons on the bench would be equally essential, if the court should consist of more than one judge, as in many cases it may; and if it should consist of a single judge, that such protection would be impossible. A similar objection might be raised to the composition of any appellate court to which the case, after verdict, might be carried.

The position that in cases where the rights of colored per-

.sons are concerned, justice will not be done to them unless they have a mixed jury, is founded upon the notion that in such cases white persons will not be fair and honest jurors. If this position be correct, there ought not to be any white persons on the jury where the interests of colored persons only are involved. That jury would not be an honest or fair one, of which any of its members should be governed in his judgment by other considerations than the law and the evidence; and that decision would hardly be considered just which should be reached by a sort of compromise, in which the prejudices of one race were set off against the prejudices of the other. To be consistent, those who hold this notion should contend that in cases affecting members of the colored race only, the juries should be composed entirely of colored persons, and that the presiding judge should be of the same race. To this result the doctrine asserted by the District Court logically leads. The jury *de medietate linguæ*, anciently allowed in England for the trial of an alien, was expressly authorized by statute, probably as much because of the difference of language and customs between him and Englishmen, and the greater probability of his defence being more fully understood, as because it would be heard in a more friendly spirit by jurors of his own country and language.

If these views as to the purport and meaning of the Thirteenth and Fourteenth Amendments to the Constitution be correct, there is no warrant for the act of Congress under which the indictment in this case was found, and the arrest and imprisonment of the petitioner were unlawful, and his release should be ordered.

The case is one which should not be delayed for the slow process of a trial in the court below, and a subsequent appeal, in case of conviction, to this court to be heard years hence. The Commonwealth of Virginia has represented to us that the services of her judicial officer are needed in her courts for the administration of justice between her citizens, and she asks that the highest tribunal of the Union will release him from his unlawful arrest, in order that he may perform the duties of his office. Those who regard the independence of the States in all their reserved powers, — and this includes the independence

of their legislative, judicial, and executive departments, — as essential to the successful maintenance of our form of government, cannot fail to view with the gravest apprehension for the future, the indictment, in a court of the United States, of a judicial officer of a State for the manner in which he has discharged his duties under her laws, and of which she makes no complaint. The proceeding is a gross offence to the State: it is an attack upon her sovereignty in matters over which she has never surrendered her jurisdiction. The doctrine which sustains it, carried to its logical results, would degrade and sink her to the level of a mere local municipal corporation; for if Congress can render an officer of a State criminally liable for the manner in which he discharges his duties under her laws, it can prescribe the nature and extent of the penalty to which he shall be subjected on conviction; it may imprison him for life, or punish him by removal from office. And if it can make the exclusion of persons from jury service on account of race or color a criminal offence, it can make their exclusion from office on that account also criminal; and, adopting the doctrine of the district judge in this case, the failure to appoint them to office will be presumptive evidence of their exclusion on that ground. To such a result are we logically led. The legislation of Congress is founded, and is sustained by this court, as it seems to me, upon a theory as to what constitutes the equal protection of the laws, which is purely speculative, not warranted by any experience of the country, and not in accordance with the understanding of the people as to the meaning of those terms since the organization of the government.