# THE UNITED STATES *v.* MURRAY STANLEY AND FOUR OTHER CASES.

*( United States Supreme Court, October Term, 1883.)*

1. THE CIVIL RIGHTS CASES—SECS. 1 AND 2 UNCONSTITUTIONAL. The first and second sections of the Civil Rights Act, passed March 1, 1875, are unconstitutional enactments as applied to the several States, not being authorized by either the XIIIth or XIVth Amendments of the Constitution.

2. The XIVth Amendment is prohibitory upon the States only, and the Legislation authorized to be adopted by Congress for enforcing it is not *direct* legislation on the matters respecting which the States are prohibited from making or enforcing certain laws, or doing certain acts, but is *corrective* legislation, such as may be necessary or proper for counteracting and redressing the effect of such laws or acts.

3. The XIIIth Amendment relates only to slavery and involuntary servitude (which it abolishes); and although, by its reflex action, it establishes universal freedom in the United States, and Congress may probably pass laws directly enforcing its provisions; yet such legislative power extends only to the subject of slavery and its incidents; and the denial of equal accommodations in inns, public conveyances and places of public amusement (which is forbidden by the sections in question), imposes no badge of slavery or involuntary servitude upon the party, but at most, infringes rights which are protected from State aggression by the XIVth Amendment.

4. Whether the accommodations and privileges sought to be protected by the first and second sections of the Civil Rights Act, are or are not, rights constitutionally demandable ; and if they are, in what form they are to be protected, is not now decided.

5. Nor is it decided whether the law as it stands is operative in the Territories and District of Columbia; the decision only relating to its validity as applied to the States.

6. Nor is it decided whether Congress, under the commercial power, may or may not pass a law securing to all persons equal accommodations on lines of public conveyance between two or more States.

Mr. Justice BRADLEY delivered the opinion of the Court:

These cases are all founded on the first and second sections of the act of Congress, known as the Civil Rights Act, passed March 1, 1875, entitled, "An act to protect all citizens in their civil and legal rights." (18 Stat., 335.) Two of the cases, those against Stanley and Nichols, are indictments for denying to persons of color the accommodations and privileges of an inn or hotel; two of them, those against Ryan and Singleton,

are, one an information, the other an indictment, for denying
to individuals the privileges and accommodations of a theatre,
the information against Ryan being for refusing a colored per-
son a seat in the dress circle of Maguire's Theatre in San
Francisco; and the indictment against Singleton being for de-
nying to another person, whose color is not stated, the full en-
joyment of the accommodations of the theatre known as the
Grand Opera House in New York, "said denial not being made
for any reasons by law applicable to citizens of every race and
color, and regardless of any previous condition of servitude."
The case of Robinson and wife against the Memphis &
Charleston R. R. Company was an action brought in the Cir-
cuit Court of the United States for the Western District of
Tennessee, to recover the penalty of five hundred dollars given
by the second section of the act; and the gravamen was the
refusal by the conductor of the railroad to allow the wife to
ride in the ladies' car, for the reason, as stated in one of the
counts, that she was a person of African descent.   The jury
rendered a verdict for the defendants in this case upon the
merits under a charge of the Court, to which a bill of excep-
tions was taken by the plaintiffs.   The case was tried on the
assumption by both parties of the validity of the act of Con-
gress; and the principal point made by the exceptions was,
that the Judge allowed evidence to go to the jury tending to
show that the conductor had reason to suspect that the plain-
tiff, the wife, was an improper person, because she was in com-
pany with a young man whom he supposed to be a white
man, and on that account inferred that there was some im-
proper connection between them; and the Judge charged the
jury, in substance, that if this was the conductor's *bona fide*
reason for excluding the woman from the car, they might take
it into consideration on the question of the liability of the
company.   The case is brought here by a writ of error at the
suit of the plaintiffs. The cases of Stanley, Nichols and Single-
ton, come up on certificates of division of opinion between the
Judges below as to the constitutionality of the first and second
sections of the act referred to; and the case of Ryan, on a writ
of error to the judgment of the Circuit Court for the District
of California sustaining a demurrer to the information.

It is obvious that the primary and important question in all the cases, is the constitutionality of the law: for if the law is unconstitutional none of the prosecutions can stand.

The sections of the law referred to provide as follows:

"Sec. 1. That all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement; subject only to the conditions and limitations established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude.

"Sec. 2. That any person who shall violate the foregoing section by denying to any citizen, except for reasons by law applicable to citizens of every race and color, and regardless of any previous condition of servitude, the full enjoyment of any of the accommodations, advantages, facilities, or privileges in said section enumerated, or by aiding or inciting such denial, shall, for every such offense, forfeit and pay the sum of five hundred dollars to the person aggrieved thereby, to be recovered in an action of debt, with full costs; and shall also, for every such offense, be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than five hundred nor more than one thousand dollars, or shall be imprisoned not less than thirty days nor more than one year: *Provided*, That all persons may elect to sue for the penalty aforesaid, or to proceed under their rights at common law and by State statutes; and having so elected to proceed in the one mode or the other, their right to proceed in the other jurisdiction shall be barred. But this provision shall not apply to criminal proceedings, either under this act or the criminal law of any State: *And provided further,* That a judgment for the penalty in favor of the party aggrieved, or a judgment upon an indictment, shall be a bar to either prosecution respectively."

Are these sections constitutional? The first section, which is the principal one, cannot be fairly understood without attending to the last clause, which qualifies the preceding part. The essence of the law is, not to declare broadly that all persons shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances and theatres; but that such enjoyment shall not be subject to any conditions applicable only to citizens of a particular race or color, or who have been in a pre-

vious condition of servitude.    In other words, it is the pur-
pose of the law to declare that, in the enjoyment of the ac-
commodations and privileges of inns, public conveyances,
theatres, and other places of public amusement, no distinction
shall be made between citizens of different race or color, or be-
tween those who have, and those who have not, been slaves.
Its·effect is to declare, that in all inns, public conveyances and
places of amusement, colored citizens, whether formerly slaves
or not, and citizens of other races, shall have the same accom-
modations and privileges in all inns, public conveyances and
places of amusement as are enjoyed by white citizens; and
*vice versa*.    The second section makes it a penal offense in any
person to deny to any citizen of any race or color, regardless
of previous servitude, any of the accommodations or privileges
mentioned in the first section.

Has Congress constitutional power to make such a law?   Of
course no one will contend that the power to pass it was con-
tained in the Constitution before the adoption of the last three
amendments.    The power is sought, first, in the XIVth
Amendment, and the views and arguments of distinguished
Senators, advanced whilst the law was under consideration,
claiming authority to pass it by virtue of that amendment, are
the principal arguments adduced in favor of the power.    We
have carefully considered those arguments, as was due to the
eminent ability of those who put them forward, and have felt,
in all its force, the weight of authority which always invests a
law that Congress deems itself competent to pass.    But the re-
sponsibility of an independent judgment is now thrown upon
this Court; and we are bound to exercise it according to the
best lights we have.

The first section of the XIVth Amendment (which is the
one relied on), after declaring who shall be citizens of the
United States, and of the several States, is prohibitory in its
character, and prohibitory upon the States.    It declares that
"no State shall make or enforce any law which shall abridge
the privileges or immunities of citizens of the United States;
nor shall any State deprive any person of life, liberty or prop-
erty without due process of law; nor deny to any person
within its jurisdiction the equal protection of the law."    It is

State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject matter of the amendment. It has a deeper and broader scope. It nullifies and makes void all State legislation, and State action of every kind, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due process of law, or which denies to any of them the equal protection of the laws. It not only does this, but in order that the national will, thus declared, may not be a mere *brutum fulmen,* the last section of the amendment invests Congress with power to enforce it by appropriate legislation. To enforce what? To enforce the prohibition. To adopt appropriate legislation for correcting the effects of such prohibited State laws and State acts, and thus to render them effectually null, void and innocuous. This is the legislative power conferred upon Congress, and this is the whole of it. It does not invest Congress with power to legislate upon subjects which are within the domain of State legislation; but to provide modes of relief against State legislation, or State action, of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights, but to provide modes of redress against the operation of State laws, and the action of State officers, executive or judicial, when these are subversive of the fundamental rights specified in the amendment. Positive rights and privileges are undoubtedly secured by the XIVth Amendment; but they are secured by way of prohibition against State laws and State proceedings affecting those rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect; and such legislation must necessarily be predicated upon such supposed State laws or State proceedings, and be directed to the correction of their operation and effect. A quite full discussion of this aspect of the amendment may be found in *U. S.* v. *Cruikshank,* 92 U. S., 542; *Virginia* v. *Rives,* 100 U. S., 313; and *Ex parte* Virginia, 100 U. S., 339.

An apt illustration of this distinction may be found in some of the provisions of the original Constitution. Take the subject of contracts, for example. The Constitution prohibited

the States from passing any law impairing the obligation of contracts. This did not give to Congress power to provide laws for the general enforcement of contracts; nor power to invest the Courts of the United States with jurisdiction over contracts, so as to enable parties to sue upon them in those Courts. It did, however, give the power to provide remedies by which the impairment of contracts by State legislation might be counteracted and corrected; and this power was exercised. The remedy which Congress actually provided was that contained in the 25th section of the judiciary act of 1789, giving to the Supreme Court of the United States jurisdiction by writ of· error to review the final decisions of State Courts whenever they should sustain the validity of a State statute or authority alleged to be repugnant to the Constitution or laws of the United States. By this means, if a State law was passed impairing the obligation of a contract, and the State tribunals sustained the validity of the law, the mischief could be corrected in this Court. The legislation of Congress, and the proceedings provided for under it, were corrective in their character. No attempt was made to draw into the United States Courts the litigation of contracts generally; and no such attempt would have been sustained. We do not say that the remedy provided was the only one that might have been provided in that case. Probably Congress had power to pass a law giving to the Courts of the United States direct jurisdiction over contracts alleged to be impaired by a State law; and under the broad provisions of the act of March 3, 1875, giving to the Circuit Courts jurisdiction of all cases arising under the Constitution and laws of the United States, it is possible that such jurisdiction now exists. But under that, or any other law, it must appear as well by allegation as proof at the trial, that the Constitution had been violated by the action of the State Legislature. Some obnoxious State law, passed, or that might be passed, is necessary to be assumed in order to lay the foundation of any Federal remedy in the case; and for the very sufficient reason, that the constitutional prohibition is against *State laws* impairing the obligation of contracts.

And so in the present case, until some State law has been passed, or some State action through its officers or agents has

been taken, adverse to the rights of citizens sought to be protected by the XIVth Amendment, no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity; for the prohibitions of the amendment are against State laws and State acts done under State authority. Of course, legislation may, and should be, provided in advance to meet the exigency when it arises; but it should be adapted to the mischief and wrong which the amendment was intended to provide against; and that is, State laws or State action of some kind, adverse to the rights of the citizen secured by the amendment. Such legislation cannot properly cover the whole domain of rights appertaining to life, liberty and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make Congress take the place of State Legislatures, and to supersede them. It is absurd to affirm that, because the rights of life, liberty and property (which include all the civil rights that men have), are by the amendment sought to be protected against invasion on the part of the State without due process of law, Congress may therefore provide due process of law for their vindication in every case; and that, because the denial by a State to any persons of the equal protection of the laws, is prohibited by the amendment, therefore Congress may establish laws for their equal protection. In fine, the legislation which Congress is authorized to adopt in this behalf is not general legislation upon the rights of the citizen, but corrective legislation; that is, such as may be necessary and proper for counteracting such laws as the States may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing, or such acts and proceedings as the States may commit or take, and which, by the amendment, they are prohibited from committing or taking. It is not necessary for us to state, if we could, what legislation would be proper for Congress to adopt. It is sufficient for us to examine whether the law in question is of that character.

An inspection of the law shows that it makes no reference whatever to any supposed or apprehended violation of the

XIVth Amendment on the part of the States. It is not predicated on any such view. It proceeds *ex directo* to declare that certain acts committed by individuals shall be deemed offenses, and shall be prosecuted and punished by proceedings in the Courts of the United States. It does not profess to be corrective of any constitutional wrong committed by the States; it does not make its operation to depend upon any such wrong committed. It applies equally to cases arising in States which have the justest laws respecting the personal rights of citizens, and whose authorities are ever ready to enforce such laws, as to those which arise in the States that may have violated the prohibition of the amendment. In other words, it steps into the domain of local jurisprudence, and lays down rules for the conduct of individuals in society towards each other, and imposes sanctions for the enforcement of those rules, without referring in any manner to any supposed action of the State or its authorities.

If this legislation is appropriate for enforcing the prohibitions of the amendment, it is difficult to see where it is to stop. Why may not Congress, with equal show of authority, enact a code of laws for the enforcement and vindication of all rights of life, liberty and property? If it is supposable that the States may deprive persons of life, liberty and property without due process of law (and the amendment itself does suppose this), why should not Congress proceed at once to prescribe due process of law for the protection of every one of these fundamental rights, in every possible case, as well as to prescribe equal privileges in inns, public conveyances and theatres? The truth is, that the implication of a power to legislate in this manner is based upon the assumption that if the States are forbidden to legislate or act in a particular way on a particular subject, and power is conferred upon Congress to enforce the prohibition, this gives Congress power to legislate generally upon that subject, and not merely power to provide modes of redress against such State legislation or action. The assumption is certainly unsound. It is repugnant to the Xth Amendment of the Constitution, which declares that powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

We have not overlooked the fact that the fourth section of the act now under consideration has been held by this Court to be constitutional. That section declares "that no citizen, possessing all other qualifications which are or may be prescribed by law, shall be disqualified for service as grand or petit juror in any Court of the United States, or of any State, on account of race, color, or previous condition of servitude; and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid, shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five thousand dollars."

In *Ex parte* Virginia (100 U. S., 339), it was held that an indictment against a State officer under this section for excluding persons of color from the jury list, is sustainable. But a moment's attention to its terms will show that the section is entirely corrective in its character. Disqualifications for service on juries are only created by the law, and the first part of the section is aimed at certain disqualifying laws, namely, those which make mere race or color a disqualification; and the second clause is directed against those who, assuming to use the authority of the State government, carry into effect such a rule of disqualification. In the Virginia case, the State, through its officer, enforced a rule of disqualification which the law was intended to abrogate and counteract. Whether the statute book of the State actually laid down any such rule of disqualification, or not, the State, through its officer, enforced such a rule; and it is against such State action, through its officers and agents, that the last clause of the section is directed. This aspect of the law was deemed sufficient to divest it of any unconstitutional character, and makes it differ widely from the first and second sections of the same act, which we are now considering.

These sections, in the objectionable features before referred to, are different also from the law ordinarily called the "Civil Rights Bill," originally passed April 9, 1866, and re-enacted with some modifications in sections 16, 17, 18 of the enforcement act passed May 31, 1870. That law, as re-enacted, after declaring that all persons within the jurisdiction of the United

States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and none other, any law, statute, ordinance, regulation or custom to the contrary notwithstanding, proceeds to enact that any person who, under color of law, statute, ordinance, regulation or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any rights secured or protected by the preceding section (above quoted), or to different punishment, pains or penalties, on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and subject to fine and imprisonment as specified in the act. This law is clearly corrective in its character, intended to counteract and furnish redress against State laws and proceedings, and customs having the force of law, which sanction the wrongful acts specified. In the Revised Statutes, it is true, a very important clause, to wit, the words "any law, statute, ordinance, regulation or custom to the contrary notwithstanding," which gave the declaratory section its point and effect, are omitted; but the penal part, by which the declaration is enforced, and which is really the effective part of the law, retains the reference to State laws, by making the penalty apply only to those who should subject parties to a deprivation of their rights under color of any statute, ordinance, custom, etc., of any State or Territory: thus preserving the corrective character of the legislation. (Rev. Stats., Secs. 1977, 1978, 1979, 5510.) The civil rights bill here referred to is analagous in its character to what a law would have been under the original Constitution, declaring that the validity of contracts should not be impaired, and that if any person bound by a contract should refuse to comply with it, under color or pretense that it had been rendered void or invalid by a State law, he should be liable to an action upon it in the Courts of the United States, with the addition of a penalty for setting up such an unjust and unconstitutional defense.

In this connection it is proper to state that civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true, whether they affect his person, his property, or his reputation; but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the State for redress. An individual cannot deprive a man of his right to vote, to hold property, to buy and to sell, to sue in the Courts, or to be a witness or a juror; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; he may commit an assault against the person, or commit murder, or use ruffian violence at the polls, or slander the good name of a fellow citizen; but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right; he will only render himself amenable to satisfaction or punishment; and amenable therefor to the laws of the State where the wrongful acts are committed. Hence, in all those cases where the Constitution seeks to protect the rights of the citizen against discriminative and unjust laws of the State by prohibiting such laws, it is not individual offenses, but abrogation and denial of rights which it denounces, and which it clothes the Congress with power to provide a remedy. This abrogation and denial of rights, for which the States alone were or could be responsible, was the great seminal and fundamental wrong which was intended to be remedied. And the remedy to be provided must necessarily be predicated upon that wrong. It must assume that in the cases provided for, the evil or wrong actually committed rests upon some State law or State authority for its excuse and perpetration.

Of course, these remarks do not apply to those cases in which Congress is clothed with direct and plenary powers of legislation over the whole subject, accompanied with an express or implied denial of such power to the States, as in the

regulation of commerce with foreign nations, among the several States, and with the Indian tribes, the coining of money, the establishment of post-offices and post-roads, the declaring of war, etc.    In these cases Congress has power to pass laws for regulating subjects specified in every detail, and the conduct and transactions of individuals in respect thereof.    But where a subject is not submitted to general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular State legislation or State action in reference to that subject, the power given is limited by its object, and any legislation of Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited State laws or proceedings of State officers.

If the principles of interpretation which we have laid down are correct, as we deem them to be, (and they are in accord with the principles laid down in the cases before referred to, as well as the recent case of *United States* v. *Harris*, decided at the last term of this Court,) it is clear that the law in question cannot be sustained by any grant of legislative power made to Congress by the XIVth Amendment.    That amendment prohibits the States from denying any person the equal protection of the laws, and declares that Congress shall have the power to enforce, by appropriate legislation, the provisions of that amendment.    The law in question, without any reference to adverse State legislation on the subject, declares that all persons shall be entitled to equal accommodations and privileges of inns, public conveyances, and places of public amusement, and imposes a penalty upon any individual who shall deny to any citizen such equal accommodations and privileges.    This is not corrective legislation; it is primary and direct; it takes immediate and absolute possession of the subject of the right of admission to inns, public conveyances, and places of amusement.    It supersedes and displaces State legislation on the same subject, or only allows it permissive force.    It ignores such legislation, and assumes that the matter is one that belongs to the domain of national regulation.    Whether it would not have been a more effective protection of the rights of citizens to have clothed Congress with plenary power over the

whole subject, is not now the question. What we have to decide is, whether such plenary power has been conferred upon Congress by the XIVth Amendment; and, in our judgment, it has not.

We have discussed the question presented by the law on the assumption that a right to enjoy equal accommodations and privileges in all inns, public conveyances, and places of public amusement, is one of the essential rights of the citizen which no State can abridge or interfere with. Whether it is such a right, or not, is a different question, which, in the view we have taken of the validity of the law on the ground already stated, it is not necessary to examine.

We have also discussed the validity of the law in reference to cases arising in the States only; and not in reference to cases arising in the Territories or the District of Columbia, which are subject to the plenary legislation of Congress in every branch of municipal regulation. Whether the law would be a valid one as applied to the Territories and the District is not a question for consideration in the cases before us: they all being cases arising within the limits of States. And whether Congress, in the exercise of its power to regulate commerce amongst the several States, might or might not pass a law regulating rights in public conveyances passing from one State to another, is also a question which is not now before us, as the sections in question are not conceived in any such view.

But the power of Congress to adopt direct and primary, as distinguished from corrective legislation on the subject in hand, is sought, in the second place, from the XIIIth Amendment, which abolishes slavery. This amendment declares "that neither slavery, nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction;" and it gives Congress power to enforce the amendment by appropriate legislation.

This amendment as well as the XIVth, is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary

and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the amendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.

It is true, that slavery cannot exist without law, any more than property in lands and goods can exist without law; and, therefore, the XIIIth Amendment may be regarded as nullifying all State laws which establish or uphold slavery. But it has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States; and it is assumed, that the power vested in Congress to enforce the article by appropriate legislation, clothes Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States; and upon this assumption it is claimed, that this is sufficient authority for declaring by law that all persons shall have equal accommodations and privileges in all inns, public conveyances, and places of public amusement; the argument being, that the denial of such equal accommodations and privileges is, in itself, a subjection to a species of servitude within the meaning of the amendment. Conceding the major proposition to be true, that Congress has a right to enact all necessary and proper laws for the obliteration and prevention of slavery with all its badges and incidents, is the minor proposition also true, that the denial to any person of admission to the accommodations and privileges of an inn, a public conveyance, or a theatre, does subject that person to any form of servitude, or tend to fasten upon him any badge of slavery? If it does not, then power to pass the law is not found in the XIIIth Amendment.

In a very able and learned presentation of the cognate question as to the extent of the rights, privileges and immunities of citizens which cannot rightfully be abridged by State laws under the XIVth Amendment, made in a former case, a long list of burdens and disabilities of a servile character, incident to feudal vassalage in France, and which were abolished by

the decrees of the national assembly, was presented for the purpose of showing that all inequalities and observances exacted by one man from another, were servitudes, or badges of slavery, which a great nation, in its effort to establish universal liberty, made haste to wipe out and destroy. But these were servitudes imposed by the old law, or by long custom which had the force of law, and exacted by one man from another without the latter's consent. Should any such servitudes be imposed by a State law, there can be no doubt that the law would be repugnant to the XIVth, no less than to the XIIIth Amendment; nor any greater doubt that Congress has adequate power to forbid any such servitude from being exacted.

But is there any similarity between such servitudes and a denial by the owner of an inn, a public conveyance, or a theater, of its accommodations and privileges to an individual, even though the denial be founded on the race or color of that individual? Where does any slavery or servitude, or badge of either, arise from such an act of denial? Whether it might not be a denial of a right which, if sanctioned by the State law, would be obnoxious to the prohibitions of the XIVth Amendment, is another question. But what has it to do with the question of slavery?

It may be that by the black code (as it was called), in the times when slavery prevailed, the proprietors of inns and public conveyances were forbidden to receive persons of the African race, because it might assist slaves to escape from the control of their masters. This was merely a means of preventing such escapes, and was no part of the servitude itself. A law of that kind could not have any such object now, however justly it might be deemed an invasion of the party's legal right as a citizen, and amenable to the prohibitions of the XIVth Amendment.

The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movement except by the master's will, disability to hold property, to make contracts, to have a standing in Court, to be a witness against a white person, and such like burdens and incapacities, were the insepar-

able incidents of the institution. Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offenses. Congress, as we have seen, by the Civil Rights Bill of 1866, passed in view of the XIIIth Amendment, before the XIVth was adopted, undertook to wipe out these burdens and disabilities, the necessary incidents of slavery, constituting its substance and visible form; and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens. Whether this legislation was fully authorized by the XIIIth Amendment alone, without the support which it afterward received from the XIVth Amendment, after the adoption of which it was re-enacted with some additions, it is not necessary to inquire. It is referred to for the purpose of showing that at that time (in 1866) Congress did not assume, under the authority given by the XIIIth Amendment, to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery. .

We must not forget that the province and scope of the XIIIth and XIVth Amendments are different; the former simply abolished slavery; the latter prohibited the States from abridging the privileges or immunities of citizens of the United States, from depriving them of life, liberty or property without due process of law, and from denying to any the equal protection of the laws. The amendments are different, and the powers of Congress under them are different. What Congress has power to do under one, it may not have power to do under the other. Under the XIIIth Amendment, it has only to do with slavery and its incidents. Under the XIVth Amendment, it has power to counteract and render nugatory all State laws and proceedings which have the effect to abridge any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty or property without due

process of law, or to deny to any of them the equal protection of the laws. Under the XIIIth Amendment, the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not; under the XIVth Amendment, as we have already shown, it must necessarily be, and can only be, corrective in its character, addressed to counteract and afford relief against State regulations or proceedings.

The only question under the present head, therefore, is, whether the refusal to any persons of the accommodations of an inn, or a public convayance, or a place of public amusement, by an individual, and without any sanction or support from any State law or regulation, does inflict upon such persons any manner of servitude, or form of slavery, as those terms are understood in this country? Many wrongs may be obnoxious to the prohibitions of the XIVth Amendment which are not, in any just sense, incidents or elements of slavery. Such, for example, would be the taking of private property without due process of law; or allowing persons who have committed certain crimes (horse stealing, for example) to be seized and hung by the *posse comitatus* without regular trial; or denying to any person, or class of persons, the right to pursue any peaceful avocations allowed to others. What is called class legislation would belong to this category, and would be obnoxious to the prohibitions of the XIVth Amendment, but would not necessarily be so to the XIIIth, when not involving the idea of any subjection of one man to another. The XIIIth Amendment has respect, not to distinctions of race, or class, or color, but to slavery. The XIVth Amendment extends its protection to races and classes, and prohibits any State legislation which has the effect of denying to any race or class, or to any individual, the equal protection of the laws.

Now, conceding, for the sake of the argument, that the admission to an inn, a public conveyance, or a place of public amusement, on equal terms with all other citizens, is the right of every man and all classes of men, is it any more than one of those rights which the States by the XIVth Amendment

are forbidden to deny to any person? And is the Constitution violated until the denial of the right has some State sanction or authority? Can the act of a mere individual, the owner of the inn, the public conveyance or place of amusement, refusing the accommodation, be justly regarded as imposing any badge of slavery or servitude upon the applicant, or only as inflicting an ordinary civil injury, properly cognizable by the laws of the State, and presumably subject to redress by those laws until the contrary appears?

After giving to these questions all the consideration their importance demands, we are forced to the conclusion that such an act of refusal has nothing to do with slavery or involuntary servitude, and that if it is violative of any right of the party, his redress is to be sought under the laws of the State; or if those laws are adverse to his rights and do not protect him, his remedy will be found in the corrective legislation which Congress has adopted, or may adopt, for counteracting the effect of State laws or State action, prohibited by the XIVth Amendment. It would be running the slavery argument into the ground to make it apply to every act of discrimination which a person may see fit to make as to the guests he will entertain, or as to the people he will take into his coach or cab or car, or admit to his concert or theater, or deal with in other matters of intercourse or business. Inn-keepers and public carriers, by the laws of all States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them. If the laws themselves make any unjust discrimination, amenable to the prohibitions of the XIVth Amendment, Congress has full power to afford a remedy under that amendment and in accordance with it.

When a man has emerged from slavery, and by the aid of beneficent legislation has shaken off the inseparable concomitants of that state, there must be some stage in the progress of his elevation when he takes the rank of a mere citizen, and ceases to be the special favorite of the laws, and when his rights as a citizen, or a man, are to be protected in the ordinary modes by which other men's rights are protected. There were thousands of free colored people in this country before the abolition

of slavery, enjoying all the essential rights of life, liberty and property the same as white citizens; yet no one, at that time, thought that it was any invasion of their personal status as freemen because they were not admitted to all the privileges enjoyed by white citizens, or because they were subjected to discriminations in the enjoyment of accommodations in inns, public conveyances and places of amusement. Mere discriminations on account of race or color were not regarded as badges of slavery. If, since that time, the enjoyment of equal rights in all these respects has become established by constitutional enactment, it is not by force of the XIIIth Amendment (which abolishes merely slavery), but by force of the XIVth and XVth Amendments.

On the whole, we are of opinion that no countenance of authority for the passage of the law in question can be found in either the XIIIth or XIVth Amendment of the Constitution; and no other ground of authority for its passage being suggested, it must necessarily be declared void, at least so far as its operation in the several States is concerned.

This conclusion disposes of the cases now under consideration. In the cases of *The United States* v. *Michael Ryan,* and of *Richard Robinson and Wife* v. *The Memphis & Charleston Railroad Company,* the judgments must be affirmed. In the other cases, the answer to be given will be that the first and second sections of the act of Congress of March 1, 1875, entitled, "An act to protect all citizens in their civil and legal rights," are unconstitutional and void, and that judgment should be rendered upon the several indictments in those cases accordingly. And it is so ordered.— *Washington Law Reporter.*