**UNITED STATES ex rel. HOWARD v. RAGEN, Warden.**

No. 45C88.

District Court, N. D. Illinois, E. D.

March 13, 1945.

William Scott Stewart, of Chicago, Ill., for relator.

George F. Barrett, Atty. Gen., of Illinois, for respondent.

SHAW, District Judge.

The petitioner is a colored man forty-three years old who has been permitted to sue herein as a poor person and who is represented in this proceeding by William Scott Stewart of Chicago who consented to act as amicus curiae. This prisoner has a bad criminal record, as will be noted herein, and it is apparent and natural that the parole board (Division of Correction of Department of Public Welfare) is of the opinion that he should be incarcerated for the longest possible time. He comes here, however, claiming the protection of the 14th amendment, and because he is a citizen of the United States he is entitled to that protection regardless of his record. So far as the decisions of the Supreme Court of Illinois are concerned the parole board is right in its rulings and if those decisions are right and correctly reflect the meaning and spirit of the 14th amendment the prisoner must be remanded. It is to that narrow point that I must direct this inquiry.

Nineteen years ago, on March 17, 1926, the petitioner was convicted of larceny in Chicago and was duly and lawfully sentenced to serve a term of from one to ten years in the Illinois Penitentiary. No question is raised as to the lawfulness of that conviction and sentence. Pursuant to mittimus issued on that judgment he was kept in custody in the penitentiary at Joliet a little more than three years, until May 17, 1929, at which time he was given a "banishee" or out-of-state parole which carried the provision that the petitioner was "To do parole in Georgia." This type of parole was authorized by the statutes of Illinois then in force and those statutory provisions provided then that if the parolee should return to Illinois he would be arrested and required to serve the remainder of his term. The act has since been amended to read be returned, but the amendment is long since petitioner's conviction and is immaterial here.

After being paroled the petitioner proceeded with some celerity to violate his agreement and promptly became an inmate of the Ohio State Penitentiary on conviction of larceny. While petitioner was so incarcerated there was correspondence between the Ohio and Illinois prison officials, and in response to an inquiry from Ohio an officer of the Illinois Division of Pardons and Paroles wrote to the Director of the Ohio State Bureau of Identification, under date of July 1932, that the petitioner had been given an out-of-state parole and that "so long as he stays out of the boundaries of Illinois we will not incur the expense against the State to apprehend him." At the time of this correspondence there was an outstanding warden's warrant for the apprehension of the prisoner dated some years prior on December 7, 1929. Apparently the lodgment of this warrant with the Ohio authorities was the cause of the correspondence. At any rate, Illinois withdrew its detainer, the prisoner completed service of his sentence and he was released from the Ohio prison.

His liberty, however, was of no great duration. In 1934 he was convicted of robbery in the State of Kentucky and sentenced to serve a term of five years in the penitentiary at Frankfort in that State, which he did serve and was again released. While there is no direct documentary evidence on the point I clearly infer from the testimony of a member of the Parole Board and its course of business that Illinois had notice and knowledge of this imprisonment and could have taken the petitioner into custody at that time had it wished to do so. Illinois refrained.

It was the testimony of this member of the Parole Board that up until 1938 it was the settled policy and practice of the Parole Board to ignore out-of-state parolees so long as they stayed out of the State; that this policy was changed in about 1938 and the new policy adopted of running down these old offenders when and where they could be found and bringing them back to serve the unserved portion of their "Time."

Pursuant to this new policy the petitioner was apprehended. He committed a second offense in Kentucky in 1941, was again sent to the Kentucky Penitentiary, and when he was released was arrested by the Illinois authorities on June 20, 1944. This arrest was made and returned on the 14-year old warrant of December 7, 1929 and, as will be noted, more than 8 years after the expiration of the mittimus under which he was originally held. Since that arrest he has been, up to the date of hearing, in the custody of the respondent, who insists on these facts that he is lawfully so held. In taking this position the warden is right if the decisions of the Supreme Court of Illinois give proper effect to the 14th amendment.

The Supreme Court of Illinois has closed the door to any further consideration of this question and has said so. I will cite the cases and quote the precise language a little later, mentioning it now only as preliminary to a statement of the position taken by the warden and the Attorney General on this hearing.

This position of the Attorney General was frank and clean-cut and, I think, quite squarely based on the Illinois decisions. In open court it was admitted that Illinois had declined to resume custody of the petitioner when he was released in Ohio in 1932 and again in Kentucky some years later. It was admitted that he was recaptured in 1944 because of a change of policy of the Parole Board and not any change in the law. In response to a direct question by the court the Attorney General stated it to be the position and theory of the State that: If a parolee violated the terms of his parole at any time within the term of his original sentence, then the State of Illinois, through its parole officers, could exercise or withhold its right to recapture and re-imprison the parolee, and that the State could withhold such action as long as it pleased and exercise it when it pleased within the lifetime of the parolee, regardless, as in this case, of the long-time expiration of the original sentence. And in this position the Attorney General is sustained by the decisions of the Supreme Court of Illinois.

Those decisions are clear and impossible of being misunderstood. They are many in number and need not all be cited. I am informed that there are one or two later ones, but the most recent to come to my attention is People v. Dixon, 387 Ill. 420,

56 N.E.2d 816, 819, in which the rule is stated and in which the matter is declared no longer open to argument. I quote from that case: " * * * It must be conceded as definitely settled in this State that from the date of his parole violation in December, 1931, he owed the State of Illinois service for the remainder of his maximum sentence, or eight years and approximately three and a half months. People v. Crowe, 387 Ill. 53, 55 N.E.2d 84; Purdue v. Ragen, 375 Ill. 98, 30 N.E.2d 637; People ex rel. Ross v. Becker, 382 Ill. 404, 47 N.E.2d 475; Ill.Rev.Stat.1931, chap. 38, par. 808, sec. 7a. This term could be satisfied only by actual service, unless remitted by some legal authority. People ex rel. Ross v. Becker, 382 Ill. 404, 47 N.E.2d 475; Purdue v. Ragen, 375 Ill. 98, 30 N.E.2d 637; People ex rel. Cassidy v. McKinley, 372 Ill. 247, 23 N.E.2d 50; People ex rel. Kerner v. McKinley, 371 Ill. 190, 20 N.E.2d 498; People ex rel. Crews v. Toman, 367 Ill. 163, 10 N.E.2d 657. There were only two methods provided by law for this unsatisfied sentence to be legally remitted, (1) a compliance with the conditions of his parole followed by a discharge granted by the parole authorities, approved by the Governor (People ex rel. Michaels v. Bowen, 367 Ill. 589, 12 N.E.2d 625); and (2) by a pardon or commutation of sentence by the Governor, the power to issue which cannot be delegated. People ex rel. Brundage v. LaBuy, 285 Ill. 141, 120 N.E. 537; People ex. rel. Fullenwider v. Jenkins, 322 Ill. 33, 152 N.E. 549. It is conceded that these are the only methods by which the term of unsatisfied service could be remitted by some legal authority, and that no such authority had been exercised. The failure of officials to perform their duties creates no right in a defendant to have his discharge as a beneficiary of their failure. People v. Crowe, 387 Ill. 53, 55 N.E.2d 84; People ex rel. Kerner v. McKinley, 371 Ill. 190, 20 N.E.2d 498; People ex rel. Courtney v. Thompson; 358 Ill. 81, 192 N.E. 693; People ex rel. Martin v. Mallary, 195 Ill. 582, 63 N.E. 508, 88 Am.St.Rep. 212."

It will be noted that in that case the case of Anderson v. Corall, 263 U.S. 193, 44 S. Ct. 43, 68 L.Ed. 247, from the United States Supreme Court is quoted from. It need only be noted in passing that the case is not in point as no officer or agent of the United States ever waived or attempted to waive custody of the prisoner nor delay execution of the judgment of the

United States. The prisoner in that case was in no different position than any other escapee. No officer of the United States waived or refused to take custody of the prisoner and no officer of the United States claimed the right to suspend execution of his mittimus or warrant indefinitely or until such time as he might see fit to recapture the prisoner. The case is no authority for the gist of the holding in the Dixon case. That gist, as I see it, lies in the last sentence: "The failure of officials to perform their duties creates no right in a defendant to have his discharge as a beneficiary of their failure."

The line of decisions of the Illinois Supreme Court seem to depend on two principal grounds: (1) that no one but the Governor can exercise the pardoning power and (2) that the failure of public officials to do their "duty" cannot inure to the benefit of a defendant. The first position is undoubtedly sound under the Constitution of Illinois, but the second would seem to be at some divergence from former holdings of that court. It appears probable that these former holdings were not called to the attention of the court in the Dixon case, as they are not mentioned in its opinion altho obviously pertinent to the issue.

Thus, in The People ex rel. Smith v. Allen, 155 Ill. 61, 39 N.E. 568, 41 L.R.A. 473, decided fifty years ago, the relator in habeas corpus was discharged on an original writ issued from the Supreme Court of Illinois. The facts were that in 1889 the relator had pleaded guilty to a felony, but judgment was stayed and he was allowed to go at large on his own recognizance. In 1893 the cause was stricken from the docket and afterwards reinstated. The defendant was thereupon sentenced to three years in the penitentiary. In the interim between plea and sentence the relator made no effort to escape but remained in Chicago. The opinion which was filed in 1895 points out that no one in Illinois has pardoning power except the Governor. It went on, however, to point out the duty of the courts in criminal cases, and the court said: " * * * if they fail to perform that duty, but discharge the prisoner or permit him to go indefinitely, their power and jurisdiction over him cease, and the subsequent sentence is without judicial authority." The relator was discharged.

In the later case of People v. Barrett, 202 Ill. 287, 67 N.E. 23, 24, 63 L.R.A. 82, 95 Am.St.Rep. 230, which was also on original petition for habeas corpus in the Supreme Court of Illinois, the defendant was allowed to be at liberty on his own recognizance for a period of two years and five months, pending disposition of a motion for a new trial. The authorities were reviewed at considerable length and many authorities from other states were cited, which would be pertinent here. Among other things the court said: "There can be no doubt that the court has the right, in a criminal cause, to delay pronouncing judgment for a reasonable time, for the purpose of hearing and determining motions for a new trial or in arrest of judgment, or to give the defendant time to perfect an appeal or writ of error, or for other proper causes; but to suspend indefinitely the pronouncing of the sentence after conviction, or to suspend indefinitely the execution of the judgment after sentence pronounced, is not within the power of the court. To allow such a power would place the criminal at the caprice of the judge. If the judge can delay the sentence one year, he could delay it for fifteen years, or any other length of time."

In that case the Illinois court proceeded to review the authorities at length and a full reading of the case shows it to have been well founded in the common law and American decisions. This case was decided 42 years ago. Later in People v. Shattuck, 274 Ill. 491, 113 N.E. 921, another original habeas corpus proceeding in the Illinois Supreme Court, the same principle was reaffirmed and it was held that where a judgment of conviction is entered, steps should promptly be taken to carry the judgment into effect and that where six years intervened pending a motion to vacate the judgment, the court lost jurisdiction. The relator in that case was discharged, and this case was decided 25 years ago. It thus appears to me that when the Supreme Court of Illinois, in the recent Dixon case, said the failure of public officials to do their duty could "not inure" to the benefit of a defendant, they were not informed of their previous decisions, none of which were mentioned in the Dixon case.

In using the phrase "inure to the benefit of a defendant" the court completely ignores the other half of the situation. It is assumed that permitting a man to stay out of jail is permitting something "to inure" to his benefit. It would appear

to be quite the opposite, except in the case of a life sentence. It is quite as probable that it would be to the benefit of the prisoner for the state to exhaust its power, collect its entire debt and permit him to be at liberty; again to be a free man, to pursue the ordinary processes of earning a living, engaging in business, going in debt for a home and its equipment and even getting married and raising a family. It is difficult to see how a suspended penitentiary sentence hanging over a man's head to fall at the mere whim of a parole board can be said to be anything inuring to his benefit. In fact it is difficult to conceive of any more refined or cruel form of torture than is thus contemplated and sustained by the Illinois Supreme Court; yet in this very case and in this court room the Attorney General insisted that the Parole Board possesses exactly and precisely this power. It is obvious that such a power cannot coexist with due process of law because under it the liberty of a citizen is not dependent upon any process of law whatsoever, but only the whim or caprice of the Parole Board in its decision to imprison or not imprison a parole violator. In the hearing on this case the Attorney General went even further, admitting and stating in open court that a parolee, even if he wished, could not force his way back into prison and voluntarily pay his debt to society to purchase his freedom, if he should so desire. These theories are offensive to my sense of justice.

It thus appears to me that in reaching its present position the Supreme Court of Illinois has not been fully advised of its previous holdings, and it might be that upon further argument of the matter that court would arrive at a different conclusion. It has, however, shut the door on further consideration of the point by saying it is no longer subject to question. Thus the Federal question of whether or not the Supreme Court of Illinois has given due weight to the 14th amendment is thrust upon me for decision under the Constitution of the United States. I have ordered the issuance of the writ, conducted this hearing and examined the arguments of counsel at some length, because it has seemed to me that in a very vital way, there is a divergence between the decisions of the Illinois Supreme Court and those of the Supreme Court of the United States. Again it appears to me that those decisions of the Supreme Court of the United States, which are so obviously pertinent, were not called to the attention of the Supreme Court of Illinois, because they are not mentioned in any of its opinions.

The Supreme Court of Illinois in the Dixon case says that the acts of public officials in failing to do their duty are not the acts of the State and are not binding on the State, whereas the Supreme Court of the United States had held otherwise in numerous cases. As early as in Ex parte Virginia, 100 U.S. 339, 347, 25 L. Ed. 676, it was pointed out that the prohibitions of the 14th amendment are addressed to the State and have reference to the actions of the political body denominated a state, by whatever instruments and in whatever modes that action may be taken. The court said: "A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibitions; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or to evade it."

■ In my opinion it is impossible to reconcile the holding of the Dixon case with this plain language from the Supreme Court of the United States, and as a Federal Judge I am bound first by the decisions of the United States Supreme Court, no matter how plain the language or persuasive the reasoning of a state court may be.

■ I have still further guidance from the Supreme Court of the United States in many other cases in which that court has made it plain that no citizen of the United States can be permitted to enjoy his liberty only at the whim, sufferance, or caprice of any other person or bodies of persons. These cases are really too numerous to be analyzed or even cited in full

and the principle is too well known—is too easily recognized as a basic necessity in the existence of a free society, to require any extended citation of authority.

Freedom from physical restraint at the mere will of another is not liberty.

The Supreme Court of the United States in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 1071, 30 L.Ed. 220, stated the law in these words: "But the fundamental rights of life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts bill of rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

It is unnecessary and would be pointless to quote further from that long and carefully prepared opinion, or from the cases cited therein, or other cases to the same effect as there can be no dissent from principles so obvious. The position of the Attorney General, supported as it is by the decisions of the Supreme Court of Illinois, is shocking to a sense of justice and in my opinion in direct conflict with the 14th amendment as interpreted by our highest and last tribunal.

It remains to dispose of certain technical objections raised by the Attorney General. He suggests in the warden's return that the petitioner has not exhausted his State remedies. This is not true for several reasons. Under the law of Illinois the petitioner had a choice of three courts in which to petition for habeas corpus (1) the county where confined, (2) the county where convicted, or (3) the Supreme Court of Illinois. He applied to the Circuit Court of Will County, where confined, and was refused. From that judgment, as the Attorney General well knows, there was and is no appeal under Illinois procedure, and the judgment was final. Indeed, being bound by the Dixon case and others above cited the Circuit Court of Will County could have done nothing else. The Supreme Court of Illinois has declared the points herein discussed to be no longer subject to question, so that door was closed. Clearly this is one of those rare and unusual cases where exceptional circumstances of peculiar urgency in which this court has jurisdiction and the duty to proceed. Reference is made to relief by writ of error or by motion in the nature of a writ of error coram nobis, but these are inappropriate for many reasons. No writ of error is permitted in habeas corpus cases. The writ of error coram nobis is never available to correct any error of which the court had notice or knowledge at the time the error was committed. Furthermore, no question exists as to the validity of the original conviction.

Technical arguments may very well be indulged in behalf of liberty. They may not be resorted to by the Government in restraint of liberty. The State is sovereign and neither needs nor can accept any technical advantage over a subject.

The petitioner is discharged.

Petitioner discharged.